**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| SHEILA A. BOYETTE and TIFFANY JIMINEZ, individually and on behalf of all others similarly situated, | ) ) ) ) | **CIVIL ACTION NO.: 1:22-cv-05280-JGK** |
| Plaintiff, | ) ) | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | ) ) | |
| MONTEFIORE MEDICAL CENTER, THE BOARD OF TRUSTEES OF MONTEFIORE MEDICAL CENTER, THE TDA PLAN COMMITTEEE, DR. MICHAEL STOCKER and JOHN DOES 1-30, | ) ) ) ) ) ) | |
| Defendants. | ) | |

Plaintiffs, Sheila A. Boyette and Tiffany Jiminez ("Plaintiffs"), by and through their attorneys, on behalf the Montefiore Medical Center 403(b) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Montefiore Medical Center ("Montefiore" or "Company"), the Board of Trustees of Montefiore Medical Center and its members, including Dr. Michael Stocker,

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants. On January 1, 2018, the two former plans offered by Montefiore, namely the Montefiore Medical Center Voluntary Tax Deferred Annuity Plan and the Montefiore Medical Center Tax Deferred Annuity Plan merged to form the Plan. The term Plan should be construed broadly to include all the two original Plans prior to 2018 and the Plan after 2018.

during the Class Period ("Board")[2] and the TSA Plan Committee and its members during the Class Period ("Committee").

2.    To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F. 2d 263, 272 n.8 (2d Cir. 1982); *see also Severstal Wheeling v. WPN Corporation*, 659 Fed.Appx. 24 (2d Cir. 2016).

3.    The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees,*" *infra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

---

[2] As will be discussed in more detail below, the Class Period is defined as June 22, 2016 through the date of judgment ("Class Period").

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 2022 WL 19935, at *3 (2022).

8.      Because cost-conscious management is fundamental to prudence in the investment function, the concept applies to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration ("RKA") fees.

9.      At all times during the Class Period, the Plan had at least $1.5 billion dollars in assets under management.  At the Plan's fiscal year end in 2020 and 2019, the Plan had over $3.2 billion dollars and $3 billion dollars, respectively, in assets under management that were/are

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

entrusted to the care of the Plan's fiduciaries. The December 31, 2020 Report of the Independent Auditor of the Montefiore Medical Center 403(b) Plan ("2020 Auditor Report") at 3.

10.     The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.

11.     The Plan is also large n terms of the number of its participants.  From 2017 to 2022 it had over 22,000 participants with account balances.  For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by retirement plans, in 2020, there were only 194 defined contribution plans (401k, 401a, and 403b) in the country with 20,000 to 29,999 participants with account balances.

12.     Accordingly, as a large plan both in terms of assets and participants, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  The Plan's massive size in terms of the number of participants also afforded it the luxury to leverage its scale to obtain low recordkeeping and administration costs.

13.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's administrative and recordkeeping ("RKA") costs.

14.      Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. §

4

1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

15.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## IV.    JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

17.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

18.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## V.  PARTIES

### **Plaintiffs**

19.      Plaintiff, Sheila A. Boyette ("Boyette"), resides in New York, NY. During her employment, Plaintiff Boyette participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA (defined above) costs which were charged as a fee against all investments in the Plan.  Plaintiff Boyette suffered injury to her Plan account by overpaying for her share of RKA costs.  In particular, Plaintiff Boyette, as of 2013, was invested in the Fidelity

Freedom 2030 Fund which was believed, and, therefore, averred, to have been be mapped to the Principle Life Time 2030 Inst Fund when the Plan discontinued the Fidelity Freedom Funds ("Boyette Investment"). The Boyette Investment was subject to the same excessive asset based charge applied to all funds in the Plan which was in turn used to pay for the excessive maintenance and monitoring fees on all the underperforming and overly expensive funds in the Plan, as discussed below. More specifically, Plaintiff Boyette suffered injury to her account by continuing to pay the excessive maintenance and monitoring fees on these underperforming and expensive funds and by continuing to pay her share of the overly expensive RKA costs through the asset based charge applied to the Boyette Investment and all investments in the Plan.

20. Plaintiff, Tiffany Jiminez ("Jiminez"), resides in Passaic, New Jersey. During her employment, Plaintiff Jiminez participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs which were charged as a fee against all investments in the Plan. Plaintiff Jiminez suffered injury to her Plan account by overpaying for her share of RKA costs. In particular, Plaintiff Jiminez invested in the BlackRock LifePath Index 2045 Fund and the MetLife Blended Fund ("Jiminez Investment"). The Jiminez Investment was subject to the same excessive asset based charge applied to all funds in the Plan which was in turn used to pay for the excessive maintenance and monitoring fees on all the underperforming and overly expensive funds in the Plan, as discussed below. More specifically, Plaintiff Jiminez suffered injury to her account by continuing to pay the excessive maintenance and monitoring fees on these underperforming and expensive funds and by continuing to pay her share of the overly expensive RKA costs through the asset based charge applied to the Jiminez Investment and all investments in the Plan.

21. Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled

to receive benefits in the amount of the difference between the value of their account currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

22.    Plaintiffs did not have knowledge of all material facts (including, among other things, total plan RKA cost comparisons to similarly-sized plans or information regarding other available funds) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

## Defendants

### Company Defendant

23.    Montefiore Medical Center is the Plan sponsor and a named fiduciary with a principal place of business at 111 E. 210th Street, Bronx, New York. The December 31, 2020 Form 5500 of the Montefiore Medical Center 403(b) Plan filed with the United States Department of Labor ("2020 Form 5500") at 1. Montefiore "provides healthcare services to more than two million people in the Bronx and Westchester County."[4]

24.    Montefiore appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for RKA and other Plan services. The Investment Policy Statement of Montefiore Medical Center Effective January 1, 2018 ("IPS") at 2. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

---

[4] https://www.montefiore.org/community last accessed on June 1, 2022.

25.     Accordingly, Montefiore during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

26.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

27.      Montefiore, acting through its Board of Directors, appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. IPS at 2. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

28.     Accordingly, each member of the Board during the putative Class Period (including Defendant Dr. Michael Stocker and otherwise referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

29.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

30.     A discussed above, Montefiore appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for RKA and other Plan services. IPS at 2.

8

31.    Specifically, the Committee is "the named fiduciary under the Plan with the responsibility to select and monitor the investment alternatives available for participant directed investment …" *Id.* Further, the Committee is to select and monitor funds in the Plan based on "past performance over a 3- and 5-year basis …" and "fees and expenses deducted from gross performance or otherwise borne by participants." IPS at 4. The Committee is required to monitor the performance of each fund on at least a semi-annual basis and remove any that are underperforming. *Id.*

32.    The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

33.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

34.    To the extent that there are additional officers, employees and/or contractors of Montefiore who are/were fiduciaries of the Plan during the Class Period or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Montefiore officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## VI.  CLASS ACTION ALLEGATIONS

35.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between June 22, 2016 through the date of judgment (the "Class Period").

36.    The members of the Class are so numerous that joinder of all members is impractical.  The 2020 Form 5500 lists 22,892 Plan "participants with account balances as of the end of the plan year."  2020 Form 5500 at 2.

37.    Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

38.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

    A.    Whether Defendants are/were fiduciaries of the Plan;

    B.    Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

10

C.    Whether the Company and Partnership Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.    The proper form of equitable and injunctive relief; and

E.    The proper measure of monetary relief.

39.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

40.    This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

41.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.    THE PLAN

42.    The Plan is a defined contribution plan covering substantially all eligible employees of Montefiore. 2020 Auditor Report at 8. More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. *Id*.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id.*

### *Eligibility*

43.    In general, the Plan covers all employees of Montefiore including full and part-time employees. 2020 Auditor Report at *Id*.

### *Contributions*

44.    There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. 2020 Auditor Report at 7.

45.    With regard to employee contributions, participants can elect to make annual pre-tax and Roth contributions subject to Internal Revenue Service ('IRS') limitations. *Id.* With regard to matching contributions made by Montefiore, Montefiore does provide a contribution for a portion of eligible compensation. *Id.* As detailed in the 2020 Auditor Report, Montefiore may match 4% of eligible compensation for employees of Mount Vernon Hospital, Montefiore New

Rochelle Hospital or Schaffer Extended Care Hospital, which are its affiliates. 2020 Auditor Report at 7. Direct employees of Montefiore are eligible for an 8% or 10% match depending on seniority. *Id.*

46.     Like other companies that sponsor 401(k) plans for their employees, Montefiore enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https:/www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

47.     Montefiore also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees    and    reduce    turnover."    *See,*    https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

48.     Given the size of the Plan, Montefiore likely enjoyed a significant tax and cost savings from offering a match.

***Vesting***

49.     With regard to contributions made by participants to the Plan, such contributions vest immediately. 2020 Auditor Report at 8. Generally, contributions made by Montefiore are subject to a vesting schedule based on years of continuous service. *Id.*

***The Plan's Investments***

50.     In theory, the Committee determines the appropriateness of the Plan's investment offerings, monitors investment performance and reviews total plan and fund costs each year. IPS at 2. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

51. Several funds were available to Plan participants for investment each year during the putative Class Period. Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

52. The Plan's assets under management for all funds as of December 31, 2020 was $3,462,065,613. 2020 Auditor Report at 3.

### *Payment of Plan Expenses*

53. During the Class Period, administrative and recordkeeping expenses were generally paid using a combination of charges to the participants and Plan assets. 2020 Auditor Report at 9.

## VIII. THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A. The Totality of the Circumstances Demonstrates that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

54. As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

55. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 2022 WL 19935, at *3.

56. Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments or monitoring RKA costs, because this information is solely within the possession of Defendants prior to discovery. *See, Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs

cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

57.     In fact, in an attempt to discover the details of the Plan's mismanagement, on December 17, 2020, Plaintiffs wrote to Montefiore requesting, *inter alia*, meeting minutes from the Committee. By correspondence dated, January 12, 2021, Montefiore failed to provide meeting minutes in response to the Plaintiffs' December 17 Correspondence.

58.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

59.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

60.     For example, Defendants did not adhere to fiduciary best practices to control Plan costs when looking at certain aspects of the Plan's administration such as monitoring investment management fees for the Plan's investments, resulting in several funds during the Class Period being more expensive than comparable funds found in similarly sized plans (conservatively, plans having over 1 billion dollars in assets).

61.     With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

62.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…"  DOL 408(b)(2) Regulation Fact Sheet.

63.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage."  "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[6]

64.     Here, Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees.

65.      Ten of the Plan's investment options, having more than $600 million dollars in assets under management in 2020, will be analyzed below as an example of imprudently selected funds. The expense ratio for one of these funds during the Class Period was *500%* above the ICI Median (in the case of Calvert US Large Cap Core Rspnb Idx I) and in another case the expense ratio was *229%* above the ICI Median (in the case of Hartford Balanced Income R6) in the same

---

[6] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

16

category. The high cost of the Plan's funds is also evident when comparing the Plan's funds to the average fees of funds in similarly-sized plans. These excessive expense ratios are detailed in the charts below:

| ICI Median | | | |
|---|---|---|---|
| **Current Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Median** |
| BNY Mellon International Bond I | 0.69 % | International Bond | 0.59% |
| Calvert US Large Cap Core Rspnb Idx I | 0.24 % | Index | 0.04% |
| Dodge & Cox International Stock | 0.63 % | International Equity | 0.49% |
| Hartford Balanced Income R6 | 0.56 % | Balanced Non-target Date | 0.17% |
| Janus Henderson Small Cap Value N | 0.67 % | Domestic Equity | 0.31% |
| Metropolitan West Total Return Bd I | 0.45 % | Domestic Bond | 0.37% |
| MFS Value R3 | 0.80 % | Domestic Equity | 0.31% |
| Morgan Stanley Inst Intl Advtg I | 0.99 % | International Equity | 0.49% |
| PGIM High Yield Z | 0.50 % | Domestic Bond | 0.37% |
| PGIM Jennison Growth Z | 0.69 % | Domestic Equity | 0.31% |

66.     The high cost of the Plan's funds is even more stark when comparing the Plan's funds to the average fees of funds in similarly-sized plans:

| ICI Average | | | |
|---|---|---|---|
| **Current Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Average** |
| BNY Mellon International Bond I | 0.69 % | International Bond | 0.59% |
| Calvert US Large Cap Core Rspnb Idx I | 0.24 % | Index | 0.06% |
| Dodge & Cox International Stock | 0.63 % | International Equity | 0.47% |
| Hartford Balanced Income R6 | 0.56 % | Balanced Non-target Date | 0.30% |
| Janus Henderson Small Cap Value N | 0.67 % | Domestic Equity | 0.37% |

17

| ICI Average | | | |
| --- | --- | --- | --- |
| Current Fund | 2021 Exp Ratio | Investment Style | ICI Average |
| Metropolitan West Total Return Bd I | 0.45 % | Domestic Bond | 0.32% |
| MFS Value R3 | 0.80 % | Domestic Equity | 0.37% |
| Morgan Stanley Inst Intl Advtg I | 0.99 % | International Equity | 0.47% |
| PGIM High Yield Z | 0.50 % | Domestic Bond | 0.32% |
| PGIM Jennison Growth Z | 0.69 % | Domestic Equity | 0.37% |

67.    It is unlikely the Defendants engaged in a prudent process from 2016 through 2020 since the Plan contained at least ten funds that had excessive expense ratios when compared to their peers from 2016 to 2020.

68.    Further, Defendants' failure to obtain reasonably-priced and properly performing investments from 2016 to 2020 is circumstantial evidence of their imprudent process to review and control the Plan's costs and is indicative of Defendants' breaches of their fiduciary duties, relating to their overall decision-making, which resulted in the payment of excessive RKA fees that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

**(B)    The Plan's Recordkeeping and Administrative Costs Were Excessive During The Class Period**

69.    Another clear indication of Defendants' imprudent fee monitoring process was the excessive recordkeeping and administrative fees Plan participants were required to pay during the Class Period.

70.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein.

18

71.    There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan).  First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A. Recordkeeping;

B. Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

C. Administrative services related to converting a plan from one recordkeeper to another;

D. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

E. Maintenance of an employer stock fund (if needed);

F. Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

G. Plan consulting services, including assistance in selecting the investment lineup offered to participants;

H. Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[7] (excluding the separate fee charged by an independent third-party auditor);

---

[7]The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

I.  Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

J.  Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

72.  This suite of essential recordkeeping services can be referred to as "Bundled" services.  These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

73.  The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  These A La Carte services typically include, but are not limited to, the following:

A.  Loan processing;

B.  Brokerage services/account maintenance (if offered by the plan);

C.  Distribution services; and

D.  Processing of qualified domestic relations orders.

74.  All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan.  In fact, several of the services, such as managed account services,

20

self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

75.    Here, it appears the Plan had three outside entities providing RKA services, namely, Fidelity, Prudential and MetLife ("Recordkeepers"). It is believed and therefore averred that Prudential and MetLife were imprudently left in the Plan after the merger of the Montefiore Medical Center Voluntary Tax Deferred Annuity Plan with the Montefiore Medical Center Tax Deferred Annuity Plan on December 31, 2017. *See,* 2020 Auditor Report at 5. While it's not *per se* imprudent to have three entities perform RKA services, here it had disastrous consequences for Plan participants. As will be discussed below, Fidelity's fees were themselves excessive but to add fees for Prudential and MetLife on top of those fee with additional revenue sharing added on top of all three appears to be a fee structure that has grown unmanageable. The more prudent approach would be to reduce the RKA providers to only one to take advantage of the economies of scale a large plan, such as the Plan, provides.

76.    Here, the Recordkeepers provided services in line with the routine bundled and A La Carte service categories described above.  The RKA services performed each year during the Class Period were similar so we can look at the Plan's 2020 Form 5500, Schedule C as an example. The Schedule C lists the following codes indicating the type of general services performed by the recordkeeper: 13, 14, 15, 37, 50, 60, 64 and 65.  Below are the typical codes associated with recordkeeping including those reported by Montefiore:

13 – Contract Administrator

14 – Plan Administrator

15 – Recordkeeping and information management (computing, tabulating, data processing etc.)

37 – Participant loan processing

50 – Direct payment from the plan

60 – Sub-transfer agency fees

64 – Recordkeeping fees

65 -- Account maintenance fees

*See* Instructions for the 2020 Schedule C (Form 5500) *available at* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2020-instructions.pdf at 27. Again, the above services are not out of the ordinary of the services other national recordkeepers provide.

77.    Here, the Plan Recordkeepers' services fell within the broad range of services described above.  As detailed in the December 2020 Fee Disclosure, the Plan charged a 0.037% fee against all assets in the Plan for Fidelity recordkeeping and also charged a 0.09% fee against all assets for all Non-Fidelity administration fees for a total of a 0.127% fee charged against all assets in the Plan. Annual Fee Disclosure Statement of Montefiore Medical Center 403(b) Plan dated December 14, 2020 ("Fee Disclosure") at 4.

78.    The cost of providing recordkeeping services often depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

79.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Here it appears the Plan used both an asset based charge and revenue sharing. Revenue sharing payments are payments made by investments within the plan, typically mutual

funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

80.    During the Class Period, many of the Plan's funds paid revenue sharing to the Plan's recordkeeper or recordkeepers. Looking at 2020 as a representative sample of the entire Class Period, revenue sharing was paid to Fidelity and potentially other administrators as follows:

| Fund in Plan in 2020 | Assets | Revenue Sharing % | Revenue Sharing |
|---|---|---|---|
| PGIM Jennison Growth | $304,738,056 | 0.25% | $761,845.14 |
| MetWest Total Return Bond | $74,994,472 | 0.10% | $74,994.47 |
| Calvert US Large-Cap Core Rspnsbl Index | $48,527,553 | 0.10% | $48,527.55 |
| MFS Value | $47,759,547 | 0.50% | $238,797.74 |
| PGIM High Yield | $40,573,538 | 0.25% | $101,433.85 |
| Morgan Stanley Intrntnl Advantage Portfolio | $37,700,211 | 0.15% | $56,550.32 |
| Dodge & Cox International Stock | $30,562,464 | 0.10% | $30,562.46 |
| BNY Mellon International Bond | $2,308,611 | 0.20% | $4,617.22 |
| | | **Total:** | $1,317,328.75 |

81.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants (*e.g., see* allegations *infra*).  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited January 17, 2021).

23

82.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

83.    In this matter, using a combination of a flat recordkeeping charge paid by participants with revenue sharing used to potentially cover additional fees resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees.

84.    Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available by conducting a Request for Proposal ("RFP") in a prudent manner to determine if recordkeeping and administrative expenses appear high in relation to the general marketplace, and specifically, of like-situated plans.  More specifically, an RFP should happen frequently if fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

85.    Because the Plan paid yearly amounts in recordkeeping fees that were well above industry standards each year over the Class Period, there is little to suggest that Defendants conducted an appropriate RFP at reasonable intervals – or certainly at any time prior to 2016 through the present - to determine whether the Plan could obtain better recordkeeping and

administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

86.    Looking at all the years during the Class Period, it's clear these unreasonably high recordkeeping costs continued throughout the Class Period. As demonstrated in the chart below, the Plan's per participant administrative and recordkeeping fees were significantly above market rates when benchmarked against similar plans.

| Year | Assets | RK Fee | Revenue Sharing[8] | Total Fee[9] | Participants | Fee PP |
|---|---|---|---|---|---|---|
| 2016 | -- | -- | -- | -- | -- | -- |
| 2017 | $2,680,363,754 | 0.127% | -- | $3,258,287.97 | 23868 | $136.51 |
| 2018 | $2,569,382,460 | 0.127% | $874,625.00 | $3,959,900.72 | 24285 | $163.06 |
| 2019 | $3,065,953,923 | 0.127% | $805,773.00 | $4,450,635.48 | 25030 | $177.81 |
| 2020 | $3,462,065,613 | 0.127% | $1,317,328.75 | $5,270,865.08 | 22892 | $230.25 |

87.    By way of comparison, we can look at what other plans are paying for RKA costs.

88.    At all times during the Class Period, the Plan had at least 22,000 participants and over $2 billion dollars in assets under management. As of 2020, the Plan had over 22,000 participants and over $3.4 billion dollars in assets under management making it eligible for some of the lowest fees on the market.

---

[8] Revenue sharing is likely conservative since there are likely additional funds that paid revenue sharing during the Class Period. An example of how revenue sharing is calculated for 2020 is found above. A similar methodology was used for the remaining years in the Class Period. 2016 and 2017 are excluded since data was incomplete for these years but similar results are expected once a complete set of data is analyzed. It's no clear if the revenue sharing in the Plan had been paid back to the Plan but even if it had, the fees are still astronomical when compared to similar plans.

[9] To keep the total fees consistent with the comparator plans analyzed below, the total fee was determined by adding any amounts reported on Schedule C of the Plan's 5500s which are reported as either direct or indirect costs and which are coded in the categories discussed above as common RKA coding which include but are not limited to 13, 14, 15, 37, 50, 60, 64, and 65. Excluded from these amounts are any amounts reported as, including but not limited to, legal, accounting and/or consulting fees. The revenue sharing column is then added to the total fee.

89.     One of the Recordkeepers throughout the Class Period was Fidelity, as noted above. Let's start with what Fidelity itself would pay if it were in Defendants' shoes. In a recent lawsuit where Fidelity's multi-billion dollar plan with over 15,000 participants was sued, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020).

90.     Specifically, Fidelity stipulated as follows:

> The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that ***Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year***. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. ***The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).***

*Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

91.     The key here is that Fidelity served as the Plan's recordkeeper during the same time period when Fidelity admitted its own plan didn't offer services broader or more valuable than any of the plans it served. Accordingly, the Montefiore Plan fiduciaries could plausibly have negotiated for RKA fees as low as $14 beginning in, at least, January 2018 when the Montefiore Plan had 24,285 Plan participants with account balances and certainly could have garnered the $14 per participant fee by 2020. Given Fidelity's admission, the Montefiore Plan fiduciaries should not have been paying more than $21 per participant in RKA fees.

92.     Looking at RKA fees for other plans of a similar size as of 2018 shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding RKA fees. The chart below analyzes a few plans with more than 15,000 participants and more than $300 million dollars in assets under management.:

| Plan Name | Number of Participants | Assets Under Management | R&A Costs on Per-Participant Basis[10] | Record-keeper |
|---|---|---|---|---|
| Fedex Office and Print Services, Inc. 401(k) Retirement Savings Plan | 17,652 | $770,290,165 | **$30** | Vanguard |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | **$26** | Great-West |
| JBS 401(k) Savings Plan | 19,420 | $374,330,167 | **$25** | Great-West |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | **$23** | T.Rowe |
| Danaher Corporation & Subsidiaries Savings Plan | 35,757 | $4,565,702,706 | **$28** | Fidelity |
| Deseret 401(k) Plan | 34,357 | $3,381,868,127 | **$25** | Great-West |
| Publicis Benefits Connection 401K Plan | 42,316 | $2,547,763,175 | **$28** | Fidelity |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,103,524321 | **$27** | Vanguard |

---

[10] In order to keep this comparator analysis consistent with the Montefiore analysis above, RKA costs in the chart are derived, in the same manner as for Montefiore, from Schedule C of the Form 5500s and reflect fees paid to service providers with service codes that signify recordkeeping, codes such as "13" "14" "15," "37," "50," "60," "64" and/or "65," are some examples, but are not limited to, these codes. *See* Instructions for Form 5500 (2020) at pg. 27 (defining each service code), https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2020-instructions.pdf at 27. In addition, the comparator plans chosen are plans that have little to no revenue sharing and it's for this reason that revenue sharing from a plan's funds are not added to per participant amounts.

93.     There are examples of other smaller plans paying much less for recordkeeping and administration costs during the same time period.  This is significant because the larger the number of participants, the lesser the per participant RKA costs should be because of the economies of scale.

| Year | Plan Name | Assets | Participants | Part Fee[10] | Recordkeeper |
|---|---|---|---|---|---|
| 2013 | Wrigley Savings Plan | $446 million | 3,146 | $26.69 | Mercer HR Services, LLC |
| 2014 | Wrigley Savings Plan | $449 million | 3,132 | $29.21 | Mercer HR Services, LLC |
| 2013 | HealthFirst Profit Sharing 401(k) | $103 million | 3,104 | $37.42 | Verisight, Inc. |
| 2014 | HealthFirst Profit Sharing 401(k) | $123 million | 3,732 | $32.74 | Verisight, Inc. |
| 2014 | Expeditors International of Washington, Inc. 401(k) Plan | $343 million | 6,334 | $38.44 | Milliman |
| 2018 | Bausch Health Companies Inc. Retirement Savings Plan | $904,717,349 | 8,902 | $36 | Fidelity |
| 2018 | Children's Medical Center of Dallas Employee Savings Plan 403(b) | $349,335,673 | 9,356 | $36 | Fidelity |
| 2018 | Ralph Lauren 401(k) Plan | $552,586,935 | 9,389 | $31 | T.Rowe |
| 2018 | Vibra Healthcare | $107,652,510 | 9,750 | $28 | Great-West |

| Year | Plan Name | Assets | Participants | Part Fee[10] | Recordkeeper |
|------|-----------|--------|--------------|---------|--------------|
|  | Retirement Plan |  |  |  |  |
| 2018 | Republic National 401(k) | $671,989,839 | 9,922 | $33 | Great-West |
| 2018 | Southern California Permanente Medical Group Tax Savings Retirement Plan | $773,795,904 | 10,770 | $31 | Vanguard |
| 2018 | Fortive Retirement Savings Plan | $1,297,404,611 | 13,502 | $35 | Fidelity |
| 2018 | DHL Retirement Savings Plan | $806,883,596 | 14,472 | $33 | Fidelity |
| 2019 | Pacific Architects and Engineers, LLC 401(k) Savings Plan | $435,391,716 | 14,698 | $23 | Fidelity |
| 2019 | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | $939,399,569 | 18,674 | $25 | Vanguard |
| 2019 | First American Financial Corporation 401(K) Savings Plan | $1,791,281,396 | 15,246 | $35 | Fidelity |
| 2019 | Michelin 401(k) Savings Plan | $2,817,613,558 | 16,335 | $36 | Vanguard |

94.    Thus, the Plan, with over 22,000 participants and over $3.4 billion dollars in assets in 2020, should have been able to negotiate a recordkeeping cost anywhere from $14 per participant to the mid-$20 range from the beginning of the Class Period to the present. Smaller plans were paying an outlier amount of $35 to $36 meaning the Plan with its significant number of participants should have been paying much less than $35 to $36 per participant for RKA fees.

95.    One final piece of data that underscores the unreasonableness of the RKA costs in this case is data released by NEPC, a consulting group. In its 15th Annual Survey titled the NEPC 2020 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees,[11] the NEPC analyzed the prudence of offering administration and recordkeeping as a percentage of assets. As discussed above, the Plan used 0.9% of total plan assets to pay for Non-Fidelity RKA costs and 0.037% for Fidelity RKA cost for a total of 0.127%. The NEPC study found that the median plan with over 15,000 participants paid no more than .04% of plan assets. In other words, the Plan was paying 217% more than the median Plan in the study.

96.    Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

**(C)    Failure to Utilize Lower Fee Share Classes**

97.    Another indication of Defendants' flawed Plan expense monitoring process resulted in the failure to identify and utilize available lower-cost share classes of many of the funds in the Plan during the Class Period.

---

[11] Available at
https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf

98.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally 1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

99.     Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for large plans like the Plan.  *See, e.g., Davis et al. v. Washington Univ. et al.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).

100.     Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

101.     Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share

31

classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

102.   Here, had the Plan's fiduciaries prudently been carrying out "the regular and ongoing monitoring of the asset classes and funds available for investment under the Plan." as their own Investment Policy states, they would have selected the lower-priced identical funds. IPS at 1.

103.   As demonstrated by the chart below, in several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's funds.  The charts below use 2020 expense ratios to demonstrate how much more expensive the funds were than their identical counterparts.

| Fund in the Plan | ER | Less Expensive Share Class | Less Expensive ER |
|---|---|---|---|
| MFS Value R3 | 0.80 % | MFS Value R6 | 0.45 % |
| PGIM High Yield Z | 0.50 % | PGIM High Yield R6 | 0.38 % |
| Vanguard Total Intl Stock Index Admiral | 0.11 % | Vanguard Total Intl Stock Index I | 0.08 % |
| BNY Mellon International Bond I | 0.69 % | BNY Mellon International Bond Y | 0.59 % |
| Metropolitan West Total Return Bd I | 0.45 % | Metropolitan West Total Return Bd Plan | 0.37 % |

104.   A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.  Instead, here, Defendants made investments with higher costs (higher expense ratios) available to participants while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received.  This reduced the likelihood that participants would achieve their preferred lifestyle in retirement.

105.   There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment. Defendants have no reasonable excuse for not knowing about the immediate availability of these lower cost share classes. Moreover, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for the Plan's participants.

106.   Indeed, because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds could not have (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility.

107.   Additionally, fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing [to pay for recordkeeping]," *Tibble III*, 2017 WL 3523737, at * 11, especially in this case where, as described below, the Plan paid well-above market rates for recordkeeping.

108.   A more prudent arrangement in this case, also more transparent and easier to comprehend by participants, would have been to take advantage of the Plan's scale by selecting available lower cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or obtain reasonable direct compensation per participant recordkeeping/administration fees.

109.   Failure to do so violated at least two tenets.  First, it violated long-standing DOL guidance which has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  See, "A Look at 401(k) Plan Fees," supra, at n.3.

110.    Second, it violates the Restatement of Trusts, which puts cost-conscious management above all else while administering a retirement plan. "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (en banc) (quoting Restatement (Third) of Trusts, § 90, cmt. B.

111.    Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with their service providers to obtain better pricing or they were asleep at the wheel and were not paying attention.  Either reason is inexcusable.

112.    As a result, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

**(D )    Several of the Funds in the Plan had Lower Cost Better Performing Alternatives in the Same Investment Style**

113.    The Plan failed to replace several of the higher cost and underperforming funds which in 2020 housed over $420 million dollars in participant assets. These funds had nearly identical lower cost alternatives during the Class Period. These funds are what's known as actively managed funds. As detailed in a well-respected investment journal: "[a]n actively managed investment fund is a fund in which a manager or a management team makes decisions about how to invest the fund's money."[12] Thus, the success or failure of an actively managed fund is linked directly to the abilities of the managers involved.

114.    Here, the performance of the managers of these funds fell well short of acceptable industry standards and they should have been replaced at the beginning of the Class Period or

---

[12] https://www.thebalance.com/actively-vs-passively-managed-funds-453773 last accessed on November 12, 2020.

sooner. Failure to do so cost the Plan and its participants millions of dollars in lost opportunity and revenue.

115. There were, at least, hundreds of superior performing less expensive alternatives available during the Class Period one of which should have been selected by the Plan.

116. The chart below choses one of these superior performing alternatives out of the hundreds available for each fund and compares them to the underperforming funds currently in the Plan:

| Current | Current ER | LFA | LFA ER | Savings |
|---|---|---|---|---|
| Janus Henderson Small Cap Value N | 0.67 % | DFA US Targeted Value I | 0.33 % | 103% |
| PGIM Jennison Growth Z | 0.69 % | American Century Investments Focused Dynamic Growth Fund R6 Class | 0.50 % | 38% |
| MFS Value R3 | 0.80 % | Vanguard Equity-Income Adm | 0.19 % | 321% |
| Dodge & Cox International Stock | 0.63 % | Bridge Builder International Equity | 0.32 % | 97% |
| BNY Mellon International Bond I | 0.69 % | PIMCO International Bond (Unhedged) Instl | 0.52 % | 33% |

117. Not only are the fees excessive as compared to the similar lower cost alternatives discussed above but the suggested alternative funds outperformed all of the funds significantly. The difference between the excessive fees paid for these underperforming funds and the suggested alternatives represent more lost savings each year for plan participants and have been compounded over the years. The underperformance of these funds as compared to the suggested alternatives increases these damages exponentially. The underperformance of these funds is represented in the chart below:

| Current | Benchmark[13] | Alternative Fund | Benchmark Relative | |
|---|---|---|---|---|
| | | | 3Y | 5Y |
| Janus Henderson Small Cap Value N | iShares Russell 2000 Value ETF | | -5.43% | -2.56% |
| | | DFA US Targeted Value I | 3.46% | 1.57% |
| | | | | |
| PGIM Jennison Growth Z | iShares Russell 1000 Growth ETF | American Century Investments Focused Dynamic Growth Fund R6 Class | -2.47% | -0.19% |
| | | | 0.08% | 3.13% |
| | | | | |
| MFS Value R3 | | | 0.0% | .20% |
| | | Vanguard Equity-Income Adm | 1.07% | 1.80% |
| | | | | |
| Dodge & Cox International Stock | iShares MSCI EAFE ETF | Bridge Builder International Equity | 0.56% | -1.30% |

---

[13] Benchmark funds are chosen from funds that meet two criteria. First, the benchmark must be similar to the fund in the Plan in that a returns-based correlation between the fund in the Plan and all other funds in the third party administrator ("TPA") universe calculated as a standard Pearson product-moment correlation coefficient. Secondly, benchmark funds are compared to the latest positions reported on filings made to the SEC, when available. Using these positions, a holdings-based correlation using the funds' positions and multi-factor risk model based on Arbitrate Pricing Theory and an advance extension of Modern Portfolio Theory. Quantitative similarity is determined as the average correlation between returns-based and holdings-based correlations. The alternative funds have historical correlation of greater than .90 with the corresponding fund in the plan.

| Current | Benchmark[13] | Alternative Fund | Benchmark Relative | |
|---|---|---|---|---|
| | | | 3Y | 5Y |
| | | | 0.77% | 0.80% |
| | | | | |
| BNY Mellon International Bond I | AdvisorShares FolioBeyond Smt Cor Bd ETF | PIMCO International Bond (Unhedged) Instl | -4.50% | -3.31% |
| | | | -3.30% | -2.09% |

118.    Because a fiduciary must have the best interests of participants in mind, performance is defined, not just on an actual return basis, but quantified on an absolute and relative volatility basis which considers returns on a risk adjusted basis.  Fiduciaries utilize Modern Portfolio Theory or a nearly identical methodology (MPT) to make such assessments and the Committee utterly failed to select prudent investments for the Plan based on several criteria under the MPT.

119.    Modern trust law and those who have a legal fiduciary duty to choose and review investments on behalf of others, apply the tools of Modern Portfolio Theory or a nearly identical methodology in evaluating a trustee's or fiduciary's investment choices and overall strategy. UPIA § 2(b) (Unif. Law Comm'n 1995); Restatement (Third) of Trusts § 90(a) (2007) ("This standard requires the exercise of reasonable care, skill, and caution, and is to be applied to investments not in isolation but in the context of the trust portfolio and as a part of an overall investment strategy, which should incorporate risk and return objectives reasonably suitable to the trust."). *See Birse v. CenturyLink, Inc.*, 2019 WL 9467530, * 5 (D. Col. Oct. 23, 2019).

120.    Had MPT theory or a nearly identical methodology been properly utilized these funds would not have been selected. The goal of MPT theory is to select funds that are among the

best in their class, and, accordingly, one would expect to see a fund with the lowest possible expense ratio available and which performed in the upper tier of its class. Even if the Defendants relied on the added excessive expensive ratios to pay for RKA fees, a prudent fiduciary utilizing MPT appropriately would have to negotiate the lowest possible administrative and recordkeeping costs available and charged only those costs, and nothing more, directly to participants or the Plan. But Defendants didn't even get close to that standard as the above allegations demonstrate that fees for the challenged funds were sometimes triple available alternative funds.

121.    What's worse, maintaining these funds in the Plan cost all participants lost savings opportunity not just those that had invested in these funds. Continuing to monitor and maintain these underperforming funds cost the Plan more in advisory services to purportedly assist the Defendants in monitoring the performance and expense of these funds. Instead, the better practice would have been to maintain funds in the Plan that paid no more expense than reasonable and simply performed better. Doing so, would have removed the need for much of the advisory fees paid during the Class Period and would have kept those expenses in participants savings accounts which would have compounded over time. In 2020, advisory fees totaled $69,750. 2020 Form 5500 at 3.

122.    A prudent fiduciary should have been aware of these better preforming lower cost alternatives and switched to them at the beginning of the Class Period.  Failure to do so is a clear indication that the Plan lacked any prudent process whatsoever for monitoring the cost and performance of the funds in the Plan.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

123.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

124.    At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

125.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

126.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint such as failing to make decisions regarding the Plan's RKA fees.

127.    The failure to engage in an appropriate and prudent process resulted in saddling the Plan and its participants with excessive Plan RKA costs.

128.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

129.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

130.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Montefiore and the Board Defendants)**

131.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

132.    Montefiore and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

133.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

134.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

40

135.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)    failing to monitor the processes by which Plan investments were evaluated; and

(c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan and pay exorbitant fees for the Plan's RKA, all to the detriment of the Plan and Plan participants' retirement savings.

136.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

137.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

41

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiff's counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated:  November 14, 2022                **CAPOZZI ADLER, P.C.**

/s/ *Donald R. Reavey*
Donald R. Reavey, Esquire
(Admitted *Pro Hac Vice*)
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
Email:  donr@capozziadler.com
Telephone:  (717) 233-4101
Fax:  (717) 233-4103

/s/ *Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
(Admitted *Pro Hac Vice*)
PA Attorney ID # 88587
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email:  markg@capozziadler.com

Telephone:  (610) 890-0200
Fax:  (717) 233-4103

Counsel for Plaintiffs and the Putative Class

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2022, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By: */s/ Donald R. Reavey*
Donald R. Reavey