UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHEILA A. BOYETTE and TIFFANY
JIMINEZ, individually and on behalf of all
others similarly situated,

                              Plaintiffs,

                    v.

MONTEFIORE MEDICAL CENTER, THE
BOARD OF TRUSTEES OF MONTEFIORE
MEDICAL CENTER, THE TDA PLAN
COMMITTEE, DR. MICHAEL STOCKER
AND JOHN DOES 1-30,

                              Defendants.

---

Case No.:  1:22-cv-05280-JGK

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

**McDermott Will & Emery LLP**
Peter John Sacripanti
John J. Calandra
Lisa Gerson
One Vanderbilt Avenue
New York, New York 10017
T: 212 547 5400
F: 212-547-5444

*Attorneys for Defendants*

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................3

    A.      The Montefiore Medical Center 403(b) Plan ............................................3

    B.      The Plan's Asset-Based Fee Structure .......................................................3

    C.      Plaintiffs' Excessive Expense Ratio Claims ..............................................5

    D.      Plaintiffs' Excessive Recordkeeping Fees Claim ......................................6

I.      PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS ...............................11

    A.      Plaintiffs Lack Standing to Pursue The Expense Ratio Claims ...........................12

    B.      Plaintiffs Also Lack Standing to Pursue Their Recordkeeping Fees Claim ..........13

II.    THE SAC FAILS TO STATE ANY PLAUSIBLE CLAIM FOR BREACH OF THE FIDUCIARY DUTY OF PRUDENCE ....................................................................14

    A.      The SAC's Criticism of the Plan's Alleged Recordkeeping Fees Fails to Create a Plausible Inference of Imprudence ..........................................14

    B.      The SAC's Challenge to Eight Investment Options Fails to Create a Plausible Inference of Imprudence ..........................................18

III.   PLAINTIFFS' FAILURE-TO-MONITOR CLAIM MUST FAIL AS WELL ................21

IV.   THE COURT SHOULD STRIKE THE VITAGLIANO EXPERT DECLARATION ....................................................................................................21

CONCLUSION.................................................................................................................23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................2, 10, 21

*Brower v. Acorn Advisors Grp. Holdings, LLC*,
  No. 17-cv-8830, 2018 WL 4830092 (S.D.N.Y. Oct. 4, 2018)...............................12

*Cunningham v. USI Ins. Servs., LLC*,
  No. 21-cv-1819, 2022 WL 889164 (S.D.N.Y. Mar. 25, 2022)...................15, 16, 21

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
  No. 17-cv-6685, 2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019) ...................... *passim*

*Forman v. TriHealth, Inc.*,
  40 F.4th 443 (6th Cir. 2022) ..................................................................................20

*Highland Cap. Mgmt., L.P. v. Schneider*,
  No. 02-cv-8098, 2004 WL 2029406 (S.D.N.Y. Sept. 9, 2004) ..............................22

*Hughes v. Northwestern Univ.*,
  142 S. Ct. 737 (2022).......................................................................................10, 11

*Kiryas Joel Alliance v. Village of Kiryas Joel*,
  495 F. App'x 183 (2d Cir. 2012) ...........................................................................10

*Laboy v. Bd. of Trustees of Bldg. Serv. 32 BJ SRSP*,
  513 F. App'x 78 (2d Cir. 2013) .............................................................................18

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)...............................................................................................10

*Matousek v. MidAmerican Energy Co.*,
  51 F.4th 274 (8th Cir. 2022) ..................................................................................16

*Nunes v. United Bhd. of Carpenters & Joiners of Am.*,
  No. 20-cv-1092, 2021 WL 1172625 (S.D.N.Y. Mar. 29, 2021).............................12

*Ong v. Chipotle Mexican Grill, Inc.*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018)................................................................22, 23

*Patterson v. Morgan Stanley*,
  No. 16-cv-6568, 2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019)....................13, 18, 19

*Perkins v. United Surgical Partners Int'l Inc.*,
No. 21-cv-973, 2022 WL 824839 (N.D. Tex. Mar. 18, 2022)...............................13

*Sacerdote v. New York Univ.*,
9 F.4th 95 (2d Cir. 2021) .....................................................................................21

*Singh v. Deloitte LLP*,
No. 21-cv-8458(JGK), 2023 WL 186679 (S.D.N.Y. Jan. 13, 2023) .............................. *passim*

*Spano v. The Boeing Co.*,
633 F.3d 574 (7th Cir. 2011) ...............................................................................12

*In re Sprint Corp. Sec. Litig.*,
232 F. Supp. 2d 1193 (D. Kan. 2002)...................................................................22

*St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013)...............................................................2, 10, 11, 18

*Tasini v. New York Times Co.*,
184 F. Supp. 2d 350 (S.D.N.Y. 2002)..................................................................10

*Thole v. U.S. Bank N.A.*,
140 S. Ct. 1615 (2020).........................................................................................11

*In re UBS ERISA Litig.*,
No. 08-cv-6696, 2014 WL 4812387 (S.D.N.Y. Sept. 29, 2014) ................................11, 12, 13

*Wehner v. Genentech, Inc.*,
No. 20-cv-6894, 2021 WL 507599 (N.D. Cal. Feb. 9, 2021) ...............................17

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
325 F. App'x 31 (2d Cir. 2009) ...........................................................................16

# INTRODUCTION[1]

This lawsuit is yet another in a long line of cases filed across the nation—and the second brought by the Capozzi Adler firm before this Court—attacking retirement plan fiduciaries for exercising their discretion in managing a defined contribution plan—in this case, the Montefiore Medical Center 403(b) Plan (the "Plan").

The Second Amended Complaint ("SAC") is Plaintiffs' second bite at the apple.   In response to Defendants' pre-motion letter seeking leave to move to dismiss the Amended Complaint  (ECF No. 22), Plaintiffs made relatively minor changes but failed to address the fatal deficiencies Defendants identified, including the bedrock issue of standing.   To that end, the SAC continues to allege that Defendants breached ERISA's duty of prudence by paying (i) allegedly excessive management fees for eight of the Plan's 40 investment vehicles (the "Expense Ratio Claims"), and (ii) allegedly excessive recordkeeping and administrative fees (the "Recordkeeping Fees Claim").

On the threshold question of standing, all of Plaintiffs' claims fail—the Expense Ratio Claims fail because neither Plaintiff was invested in any of the eight allegedly imprudent funds, and the Recordkeeping Fees Claim fails because Plaintiffs fail to plead that they paid fees in excess of the $25-$30 range the SAC alleges to be reasonable.

Plaintiffs' claims fail on the merits as well.  As to the Recordkeeping Fees Claim, Plaintiffs allege that the Plan charged unreasonably high fees as compared to other allegedly comparable plans.  The SAC, however, relies on improper expert opinion, illogical and flawed calculations, a

---

[1] Unless otherwise noted, all emphasis has been added, and all citation, alterations, and internal quotation marks have been omitted.

critical mathematical "typo", and legally unpalatable apples-to-oranges comparisons—none of which is enough to support Plaintiffs' claim.

As to the Expense Ratio Claims, Plaintiffs ignore that the test of imprudence is one of process, not outcome. Accordingly, their *post hoc* attacks on fund performance—provided as a single snapshot in time with the benefit of hindsight—are insufficient to support an inference of imprudence. Nor can imprudence be inferred from the Plan's inclusion of five allegedly higher-cost share class funds. Unlike other cases that have addressed this issue on a motion to dismiss, here the Form 5500 records incorporated by reference in the SAC reflect that participants received a benefit from the higher-cost share class funds. This benefit constitutes an "obvious alternative explanation" for Defendants' decision, thereby undermining the SAC's alleged inference of imprudence. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545, 567 (2007).

As the Second Circuit has recognized, the prospect of discovery in an ERISA breach of fiduciary duty suit is "ominous" and "elevates the possibility that a plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence." *St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013).

This concern perfectly describes the instant case. Despite Defendants having identified the above deficiencies to Plaintiffs last year, Plaintiffs have been unable to remedy any of them. Permitting this case to proceed to discovery would "take up the time of a number of people," have an "*in torrorem*" effect on settlement, and allow a fishing expedition in search of a claim. Accordingly, Defendants respectfully request that the Court dismiss the SAC with prejudice.

## FACTUAL BACKGROUND[2]

### A.    The Montefiore Medical Center 403(b) Plan

The Montefiore Medical Center 403(b) Plan (the "Plan") is a defined contribution plan covering substantially all eligible employees of Montefiore Medical Center ("Montefiore").  (SAC ¶ 43.)  From 2017 to 2022, the Plan had over 22,000 participants and between $2.6 to $3.4 billion under management.  (*Id.* ¶¶ 11, 98.)  Montefiore previously offered two 403(b) plans—the Montefiore Medical Center Voluntary Tax Deferred Annuity Plan and the Montefiore Medical Center Tax Deferred Annuity Plan—which were merged on January 1, 2018, to form the Plan. (*Id.* ¶ 1 n.1.)  Plaintiffs are two former employees of Montefiore and allege that they are participants in the Plan. (*Id.* ¶¶ 20, 21.)

### B.    The Plan's Asset-Based Fee Structure

Plaintiffs allege that their investment accounts were subjected to excessive fund maintenance and management fees ("Management Fees"), and excessive Plan recordkeeping and administrative fees ("Recordkeeping Fees").  (SAC ¶¶ 20-21.)

Management Fees are paid to the funds in which Plan participants are invested and are expressed as the particular fund's "Expense Ratio"—*i.e.*, a fixed percent of fund assets.  (*E.g.*, *id.* ¶¶ 120, 133.)  They are the subject of Plaintiffs' Expense Ratio Claims.

Recordkeeping Fees are paid to the Plan's recordkeeper.  (*Id.* ¶¶ 64, 92.)  The recordkeeper provides a variety of services to assist Montefiore in management of the Plan, such as maintaining investment records, transaction accounting, and participant tax reporting, among others.  (*Id.* ¶ 66.)  While the "vast majority" of plans charge each plan participant the same, fixed Recordkeeping Fee (a "per-capita" or "per-participant" structure), the Plan charges Recordkeeping Fees as a fixed

_____

[2] The Factual Background is taken from the SAC for purposes of this motion only.

percentage of each participant's account balance (an "asset-based" structure). (*Id.* ¶¶ 71, 92.) Under the Plan's asset-based fee structure, participants with lower account balances pay less than participants with higher balances. (*Id.* ¶¶ 20-21 (alleging Plaintiffs paid their "share" of the Plan's asset-based recordkeeping fees).)[3]

Recordkeeping Fees may be paid directly from plan assets or indirectly through a process called "revenue sharing," or some combination of both. (*Id.* ¶ 92.) Here, the SAC alleges that the Plan used both an asset-based charge (direct fees) and, for some subset of funds, revenue sharing (indirect fees that are also asset-based). (*Id.* ¶¶ 92-93.) Importantly, Plaintiffs do not allege that they invested in any of the funds that paid revenue-sharing to the Plan's recordkeeper. (*Compare id.* ¶¶ 20-21, *with id.* ¶ 93.) The SAC concedes that revenue sharing "is not *per se* imprudent." (*Id.* ¶ 75.) Although overlooked by Plaintiffs, the Plan's Form 5500s (incorporated by reference in the SAC), clearly state that revenue sharing payments are credited back to the accounts of participants invested in those revenue-sharing funds. (Declaration of John J. Calandra ("Calandra Decl.") Ex. 1 at PDF p. 42.)[4]

---

[3] An asset-based structure benefits lower-paid employees since they typically have lower asset values and thus pay less than higher-paid employees. It also follows that Plan participants with larger *current* account balances necessarily had smaller account balances in their earlier years of participation and, therefore, also received a benefit from the asset-based fee structure.

[4] The Form 5500 discloses: "Fidelity receives revenue sharing payments from certain mutual funds. . . . Fidelity *credits* the amount of such revenue sharing payments attributable to the Plan of those participants invested in the particular mutual funds *back* to the Plan, *to then be allocated to such participant accounts* as soon as administratively feasible after each quarter." (*Id.*)

### C.    Plaintiffs' Excessive Expense Ratio Claims

Plaintiffs allege that eight (8) of the Plan's 40 investment vehicles charged excessive fund management fees (or "Expense Ratios") (the "Challenged Funds").  *Plaintiffs, however, were not invested in any of the Challenged Funds*. (*Compare id.* ¶¶ 20, 21 *with id.* ¶¶ 120, 133.)  Despite their obvious lack of standing (*see infra* Section I.A), Plaintiffs seek to maintain Expense Ratio Claims falling into two categories.

First, Plaintiffs allege that the Plan failed to replace five (5) allegedly "higher cost and underperforming funds" when "nearly identical lower cost alternatives" were available (the "Challenged Performance Funds").[5]  (*Id.* ¶ 130.)  The SAC then compares the Challenged Performance Funds to five purportedly "superior performing less expensive alternatives."  (*Id.* ¶¶ 132-33.)  The comparison considers each fund's Expense Ratio and their respective 3- and 5-year investment performances measured against a "Benchmark" fund. (*Id.* ¶¶ 133-34.)  According to Plaintiffs, a "prudent fiduciary should have been aware of these better performing lower cost alternatives and switched to them *at the beginning* of the Class Period." (*Id.* ¶ 139.)  The SAC cites no facts available to the Plan fiduciaries *at the beginning* of the Class Period that should have put them on notice that the Challenged Performance Funds would under-perform in the next three or five years.

---

[5] The Challenged Performance Funds are: (1) Janus Henderson Small Cap Value N, (2) PGIM Jennison Growth Z, (3) MFS Value R3, (4) Dodge & Cox International Stock, and (5) BNY Mellon International Bond I.  (SAC ¶ 133.)

Second, Plaintiffs allege there are five (5) funds in the Plan for which Defendants failed to utilize an available, less expense share class (the "Challenged Class Funds").[6]   (*Id.*   ¶¶ 114-29.) The SAC baldly alleges that the more expensive Expense Ratio share classes chosen were the "same in every respect" and that "the Plan did not receive any additional services or benefits based on its use of more expensive share classes[.]"   (*Id.* ¶ 123.)   However, documents incorporated by reference in the SAC demonstrate the contrary to be true—four out of five of the Challenged Class Funds provide "revenue sharing" payments that are fully credited back to the Plan participants invested in those particular funds.   (*See* Calandra Decl. Ex 1, Sched. C; SAC ¶ 93; *supra* n.4.)[7]

### D.   Plaintiffs' Excessive Recordkeeping Fees Claim

As noted above, the Plan's Recordkeeping Fee structure is *asset-based*—calculated based on individual participant balances—not per-capita.   (*E.g.*, SAC ¶¶ 20-21, 92.)   Nowhere in the SAC do Plaintiffs allege what they, individually, paid each year in Recordkeeping Fees, nor that they paid *more* than the $25-$30 that the SAC alleges was a reasonable fee.   (*Id.* ¶¶ 102, 105.)

> 1.   The SAC Attempts to Derive a Fixed Per-Participant Recordkeeping Fee Even Though the Plan Charges Based On Asset-Values, Which Vary by Participant

The SAC attempts to derive a fixed "per-participant" annual Recordkeeping Fee for the Plan despite acknowledging that the Plan does not charge a per-participant fee to its participants.

---

[6]  The Challenged Class Funds are: (1) MFS Value R3, (2) PGIM High Yield Z, (3) Vanguard Total Int'l Stock Index Admiral, (4) BNY Mellon International Bond I, and (5) Metropolitan West Total Return Bd I.   (SAC ¶ 120.)   The MFS and BNY Mellon funds are challenged in both categories.

[7] As to the fifth Challenged Class Fund—Vanguard Total Int'l Stock Index Admiral—the alleged expense ratio difference is a mere 0.03%  (SAC ¶ 120.)

The derived "per-participant" fee is purportedly tabulated by using data from the Plan's Form 5500s—*i.e.*, taking total fees reportedly paid and dividing by the number of plan participants. (SAC ¶ 98 & n.14.)  The SAC alleges that for the period 2017 through 2020, the Plan paid an annual per-participant Recordkeeping Fee, including revenue sharing, of between $136.51 and $230.25.[8]  (*Id.*)  Excluding revenue sharing, the SAC alleges a per-participant annual fee of between $136.51 and $172.70.  (*Id.*)[9]  The SAC then relies on improper expert opinion to allege that a reasonable annual Recordkeeping Fee would have been in the range of $25-$30.  (*Id.* ¶ 102.) The SAC not only fails to plead that Plaintiffs paid a fee greater than $30, but it fails even to allege the percentage of Plan participants allegedly paying above this amount.  Thus, the SAC illustrates the classic difference between relying on an *average* fee (that possibly no participant actually paid) and a *median* fee (that shows how many participants actually paid above or below the $25-$30 fee the SAC alleges to be reasonable).

### 2. The SAC Uses a Different Methodology to Calculate the Plan's Recordkeeping Fees and Those of the Comparator Plans

As noted, Plaintiffs *purport* to calculate the Plan's per-participant Recordkeeping Fee and that of the comparator plan's by taking data from the respective Form 5500s—*i.e.*, dividing the

---

[8] The addition of Revenue Sharing as a *cost* to participants is facially unsustainable given that the Plan's Form 5500s explain that revenue sharing payments are credited back to participants invested in those funds.  *See supra* n.4.

[9] As the first of many errors to be discussed, although Paragraphs 98 and 99 purport to show the Plan's 2018 Total Fee with and without revenue sharing, respectively, Plaintiffs somehow came up with a *higher* fee in Paragraph 99—an illogical outcome where alleged revenue sharing has supposedly been subtracted.

total fees paid to recordkeepers, as reported on Schedule C, by the total number of plan participants, as reported in Section 6(g).  (SAC ¶ 98 n.14, ¶ 105 n.15) (explaining fee calculation method using Form 5500).  Yet, a quick review of the Form 5500s, which are incorporated by reference in and integral to the SAC, demonstrates that while this is how Recordkeeping Fees were calculated for the comparators, it is *not how they were calculated for the Plan*.  For example, taking 2018—the year used for the comparators—the SAC pleads that the Plan's 2018 Total Recordkeeping Fee (without revenue sharing) was $3,959,900.72 and then divides by 24,285 participants to derive a $163.06 per-participant fee.  (*Id.* ¶ 99.)  However, the Plan's Form 5500 shows that the Plan paid *only $890,099* in Recordkeeping Fees in 2018—not $3,959,900.72.  When the correct number ($890,099) is divided by the Plan's 24,285 participants, the per-participant fee is only $36.65.  (Calandra Decl. Ex. 1, Sched. C at 3.)[10]  In short, had the SAC really used the same methodology in its calculation of the Plan's fees, it would have computed them to be much lower and more in line with the so-called comparators' fees.[11]

---

[10] As reported on the 2018 Form 5500, the Plan paid Fidelity $832,609 (for service codes 37, 50, 64, 65) and paid Metropolitan Life $57,490 (for service codes 15 and 30), for a total of $890,099. (*Id.*)

[11] How Plaintiffs calculated the Plan's alleged total Recordkeeping Fees is not entirely clear but appears to be based on applying a 0.127% Recordkeeping Fee rate (*i.e.*, 12.7 basis points) against all Plan assets.  (SAC ¶¶ 98-99.)  Plaintiffs allege that the 0.127% rate is derived by adding two numbers—0.037% for Fidelity Recordkeeping and "0.9%" for Non-Fidelity.  (*Id.* ¶ 108.)  Of course, the Court may take judicial notice that 0.9% plus 0.037% equals 0.937%  (*i.e.*, 93.7 basis points)—not the 0.127% pleaded as the total.  Defendants presume "0.9%" is a typo, and Plaintiffs

3.      The SAC's Recordkeeping Fee Comparison is Also Based on a Critical
        Mathematical Error

The SAC also contains a critical mathematical error with respect to the comparator plans.

Among the "comparators" identified, the Sanofi U.S. Group Savings Plan ("Sanofi Plan") is the

closest in size to the Plan based on number of participants (24,097 to the Plan's 24,285).[12]  (SAC

¶¶ 99, 105.)  The Sanofi Plan also is listed as allegedly having the lowest 2018 Recordkeeping

Fee—*i.e.*, $23 per participant.  (*Id.* ¶ 105.)  However, a review of the 2018 Sanofi Form 5500

indicates that Sanofi paid its recordkeeper, T. Rowe Price, $1,082,552.  (Calandra Decl. Ex. 5,

Sched. C.)  When divided by the number of Sanofi participants, the 2018 Sanofi Recordkeeping

Fee should have been reported in the SAC as *$45 per participant*.  This error is critical because,

as corrected, the range of purportedly reasonable Recordkeeping Fees listed in the SAC should be

$25-$45—not $23-$30.  Accordingly, had the SAC used the same methodology for the Plan as it

_____

intended to plead a Non-Fidelity fee of 0.09%, as they did in the Amended Complaint (ECF No.

21 ¶ 77).  Moreover, although not necessary for this motion, the 0.09% Non-Fidelity fee is itself a

typo in the Plan's 2020 Fee Disclosure; it should have read 0.009%, for a total fee of, at most,

0.046% (*i.e.*, 4.6 basis points, not 12.7).  This typo should have been apparent to Plaintiffs from

their own account statements, as well as from the Plan's 2021 and 2022 Fee Disclosures—which

both correctly put the rate to be 0.009%. (*Compare* Calandra Decl. Ex. 2 at 4, *with id.* Exs. 3-4

at 4.)  Plaintiffs do not—and cannot—point to any account statement showing that they ever paid

0.127% (12.7 basis points) in baseline Recordkeeping Fees.

[12] However, the Sanofi Plan had more than double the assets under management in 2018 ($5.5

billion compared to the Plan's $2.6 billion).  (SAC ¶¶ 99, 105.)

used for the comparators, the Plan's 2018 Recordkeeping Fee "per-participant" would have been smack *in the middle* of that range.

## LEGAL STANDARD

*Rule 12(b)(1).*  To establish Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) can be redressed by judicial decision in the plaintiff's favor.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).   "The burden is on the plaintiff asserting jurisdiction to prove by a preponderance of the evidence that jurisdiction is proper," and "no presumptive truthfulness attaches to the complaint's jurisdictional allegations[.]"  *Tasini v. New York Times Co.*, 184 F. Supp. 2d 350, 353 (S.D.N.Y. 2002); *see also Kiryas Joel Alliance v. Village of Kiryas Joel*, 495 F. App'x 183, 188 (2d Cir. 2012) ("[P]laintiffs must allege facts that affirmatively and plausibly suggest that they have standing to sue.").  On a rule 12(b)(1) motion, "the Court has the power and the obligation to consider matters outside the pleadings to determine whether jurisdiction exits." *Singh v. Deloitte LLP*, No. 21-cv-8458(JGK), 2023 WL 186679, at *3 (S.D.N.Y. Jan. 13, 2023) (citing *Kamen v. American Tel. & Tel. Co.*, 761 F.2d 1006, 1011 (2d Cir. 1986)).

*Rule 12(b)(6).*  In assessing a Rule 12(b)(6) motion to dismiss an ERISA breach of fiduciary duty claim, courts must apply the *Iqbal* and *Twombly* pleading standards.  *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2022).  Therefore, the complaint must contain factual allegations that provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *St. Vincent*, 712 F.3d at 717.  Allegations that are "merely consistent" with a defendant's liability are not sufficient, and an "obvious alternative explanation" for a defendant's conduct will undermine plausibility and support dismissal.  *Twombly*, 550 U.S. at 545, 567.

For a breach of fiduciary duty claim to survive, the complaint must contain factual allegations demonstrating that the alleged imprudence was the result of a flawed process or facts from which the court "may reasonably infer from what is alleged that the process was flawed." *St. Vincent*, 712 F.3d at 718. "Because the content of the duty of prudence turns on 'the circumstances … prevailing' at the time the fiduciary acts … the appropriate inquiry will necessarily be context specific" and "courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 142 S. Ct. at 742. Importantly, the fiduciary's actions must be judged "based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight[.]" *St. Vincent*, 712 F.3d at 716.

Finally, on a Rule 12(b)(6) motion "the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken." *Singh*, 2023 WL 186679, at *4 (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.")). Where "documents properly considered on a motion to dismiss contradict the pleadings, the Court need not accept those pleadings as true[.]" *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, 2019 WL 4466714, at *9 (S.D.N.Y. Sept. 18, 2019).

## ARGUMENT

## I.   PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS

The Supreme Court has held that "[t]here is no ERISA exception to Article III" standing requirements. *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020). Plaintiffs cannot indirectly establish an injury-in-fact by claiming that the Plan itself suffered a loss. *See In re UBS ERISA*

*Litig.*, 2014 WL 4812387, at *6 (S.D.N.Y. Sept. 29, 2014).  Rather, "the Second Circuit's clear command" requires a plaintiff to allege that she suffered an individualized harm through her own investment.  *Id.* at *7; *see also Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011) ("It is not enough to say that the named plaintiffs want relief for the plan as a whole" because at a minimum the named plaintiffs "need to have invested in the same fund as the [putative] class members"); *Singh* 2023 WL 186679 at *4 (plaintiffs lacked standing to challenge funds in which they were not invested).

The Court should dismiss the SAC for lack of standing because (1) Plaintiffs were not invested in *any* of the Challenged Funds and did not pay the allegedly excessive Expense Ratios associated with the Challenged Funds, and (2) Plaintiffs fail to plead that *they* paid allegedly excessive Recordkeeping Fees.  Despite Defendants having pointed out these deficiencies in its pre-motion letter (ECF No. 22 at 1-2), Plaintiffs failed to address, let alone correct, them. Accordingly, the Court would be well within its discretion to (and should) dismiss the SAC without leave to amend.  *See Nunes v. United Bhd. of Carpenters & Joiners of Am.*, 2021 WL 1172625, at *6 (S.D.N.Y. Mar. 29, 2021); *Brower v. Acorn Advisors Grp. Holdings, LLC*, 2018 WL 4830092, at *7 (S.D.N.Y. Oct. 4, 2018).

## A.       Plaintiffs Lack Standing to Pursue The Expense Ratio Claims

The Plan is a defined-contribution individual account plan (SAC ¶ 43), meaning participants "direct the investment of their contributions into various investment options offered by the plan" and participants' benefits are "based solely on the amounts allocated to each individual's account."  *Singh*, 2023 WL 186679, at *1, 4.  Accordingly, where a plaintiff brings suit based on allegedly excessive expense ratios charged by funds in which the plaintiff *did not invest*, courts (including this Court) have not hesitated to find a lack of standing.  *See, e.g.*, *id.*, at *4 (dismissing claims as to four of six challenged funds in which plaintiffs were *not* invested

because "a plan participant who does not invest their plan assets into a particular fund offered in a defined-contribution plan will not have their individual plan benefit affected in any way by that fund's performance or associated fees"); *In re UBS*, 2014 WL 4812387, at *6 (plaintiff lacked standing where complaint failed to demonstrate plaintiff's investment in UBS fund).

Here, Plaintiffs allege that eight (8) funds included in the Plan charged excessive Expense Ratios (SAC ¶¶ 114-39), but Plaintiffs do not—and cannot—plead that they were invested in any of the Challenged Funds.  (*Compare id.* ¶¶ 20-21 *with id.* ¶¶ 120, 133.)  Accordingly, Plaintiff's Expense Ratio claims must be dismissed for lack of standing.  *See, e.g.*, *Singh*, 2023 WL 186679 at *4 (plaintiffs lacked standing to bring claims related to funds in which they did not invest); *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *4-6 (S.D.N.Y. Oct. 7, 2019) (same).

### B.   Plaintiffs Also Lack Standing to Pursue Their Recordkeeping Fees Claim

Plaintiffs' excessive Recordkeeping Fees claim is similarly flawed.   First, to the extent Plaintiffs' claim is based on the Plan's use of revenue sharing arrangements for certain funds, Plaintiffs have suffered no injury from that practice because, once again, Plaintiffs did not invest in those funds.  (*Compare* SAC ¶¶ 20-21, *with* ¶ 93.)  Therefore, neither Plaintiff was impacted by the alleged "worst-case scenario" of paying both "a flat recordkeeping charge [and] revenue sharing[.]"  (*Id.* ¶ 96; *Perkins v. United Surgical Partners Int'l Inc.*, No. 3:21-cv-973, 2022 WL 824839, at *4 (N.D. Tex. Mar. 18, 2022) (dismissing claim for lack of standing where "plaintiffs make no allegations that the revenue sharing fees are charged to all participants, regardless of which funds the plaintiffs invested in.").)[13]

---

[13] Even if they had invested in these funds, Plaintiffs still would have no injury because revenue sharing payments are "credited back" to the plan participants who invested in the revenue sharing funds.  *See supra* n.4.

Second, Plaintiffs allege—albeit based on improper expert opinion (*see infra* Section IV)—that a reasonable per-participant Recordkeeping Fee would have been $25-$30. (SAC ¶¶ 102-03.) Plaintiffs posit (incorrectly) that the Plan actually charged in excess of $136 per participant. (*Id.* ¶¶ 98-99.) Putting aside the numerous mathematical and other errors contained in Plaintiffs' recordkeeping allegations (*e.g.*, *supra* at 6-10), Plaintiffs lack standing to bring the excessive Recordkeeping Fee claim because neither has alleged that she paid more than the purportedly reasonable amount of $30 per year. Plaintiffs' concocted per-participant fee is irrelevant because, unlike the "vast majority" of plans, the Plan charges Recordkeeping Fees as a percentage of each individual's account balance and, therefore, fees vary by individual. (SAC ¶¶ 20-21, 71.) Because the Recordkeeping Fees actually paid by the Plaintiffs depend on their account balances (and could be $0 due to offsets, *see infra* Section II.A), a participant's fees may be well below the alleged "reasonable fee" of $30 per year. It is notable that despite Defendants having highlighted this deficiency in their pre-motion letter, Plaintiffs still fail to plead the fee each of them actually paid each year. Because Plaintiffs fail to plead a cognizable injury for Article III standing on their Recordkeeping Fees claim, the claim must be dismissed. *See Singh*, 2023 WL 186679, at *4.

## II.   THE SAC FAILS TO STATE ANY PLAUSIBLE CLAIM FOR BREACH OF THE FIDUCIARY DUTY OF PRUDENCE

### A.   <u>The SAC's Criticism of the Plan's Alleged Recordkeeping Fees Fails to Create a Plausible Inference of Imprudence</u>

Plaintiffs hinge their excessive Recordkeeping Fees claim primarily on a chart purporting to compare the Recordkeeping Fees that Plan participants purportedly paid in 2016 through 2020 (with and without revenue sharing), to the Recordkeeping Fees that eight allegedly similar-sized plans paid in 2018. (SAC ¶¶ 98-99, 105.) Putting aside the obvious problems that Plaintiffs (1) lack standing to bring this claim and (2) rely on improper expert opinion, Plaintiffs' attempt at comparison fails for the fundamental reason that the SAC is comparing apples to oranges.

-14-

First, the chart does not even claim to compare the Plan to other plans that similarly charge participants based on the value of their assets.  Plaintiffs acknowledge that the Plan uses an asset-based fee structure, while "the vast majority of plans" charge fees on a *different*, "per-participant basis." (SAC ¶¶ 20-21, 71.)  Indeed, as stated in the Plan's Fee Disclosure, many of the Plan's participants could pay $0 (due to offsets), or some other amount substantially lower than the fees purportedly charged by the comparator plans listed in the SAC and/or the per-participant fees attributed to the Plan. (Calandra Decl. Exs. 2-4, at 4.)  Plaintiffs' apples-to-oranges comparison of the Plan's fees to an entirely different fee structure—*i.e.*, per-participant—fails to create any inference of imprudence.

Second, Plaintiffs fail to plausibly explain their calculation of the Plan's purported per-participant fees, which is necessary to withstand dismissal.  *See Cunningham v. USI Ins. Servs., LLC*, 2022 WL 889164, at *5 (S.D.N.Y. Mar. 25, 2022) (dismissing excessive Recordkeeping Fee claim where plaintiff failed to allege "*how* she calculated the Plan's direct and indirect fees from the Form 5500 filings").  As discussed above, there are obvious errors in the Recordkeeping Fees alleged for the Plan.  *Supra* at 6-10.  There also is a basic, but consequential, methodological flaw. While the comparators' total Recordkeeping Fees come straight from the amount of recordkeeping fees reported on the comparators' Form 5500s (Schedule C), the Plans' Recordkeeping Fees used in the SAC do not.  Instead, Plaintiffs use a *derived* fee for the Plan—*i.e.*, calculated by Plaintiffs by multiplying total Plan assets by a purported (and inaccurate) 0.127% fee (*i.e.*, 12.7 basis points). (*Compare* SAC ¶¶ 98-99, *with id.* ¶ 105; *see also supra* n.11.)  Had the SAC used the same methodology for calculating the Plan's fees as it did for the comparators' fees, the Plan's "per-participant" fee falls *within the range* of fees (as corrected for the Sanofi error) paid by the

comparators.  *See supra* at 9-10; *Ferguson*, 2019 WL 4466714, at *9 (courts need not accept pleadings as true where contradicted by documents properly considered on the motion).

Third, the SAC "must allege more than just that the [] Plan's recordkeeping fees were higher than those of other plans."  *Singh*, 2023 WL 186679 at *5.  Rather, it must plead that the comparators' recordkeepers provided the same "basket of services" as the Plan's recordkeeper, and that the "fees were excessive relative to services rendered."  *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (affirming dismissal of breach of fiduciary duty claim); *see also Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022) ("Even if the fees here look high, we cannot infer imprudence unless similarly sized plans spend less on the same services."); *Cunningham*, 2022 WL 889164, at *4-5 (dismissing claim despite allegations that comparator plans were comparable based on similar size, similar number of participants, and "materially the same services"); *Ferguson*, 2019 WL 4466714, at *8 (dismissing claim where "Plaintiffs fail[ed] to allege that the administrative fees were excessive relative to the services rendered.").

Here, the SAC contains only the conclusory—and therefore insufficient—allegation that "[n]early all recordkeepers in the marketplace *offer* the same *range* of services" (SAC ¶ 65), and then purports to compare the Plan's "per-participant" Recordkeeping Fees with those of eight allegedly similarly-sized plans.[14]  (*Id.* ¶ 105.)  But the relevant question is not whether all

---

[14] The contention of similar size is dubious.  Four of the eight comparators have between 56% and 115% more participants than does the Plan, and the one comparator closest to the Plan in participant size has 59% higher assets under management.  (*Compare* SAC ¶¶ 11, 53, *with id.* ¶ 105.)

recordkeepers "*offer* the same *range* of services"; it is whether the services the Plan's recordkeeper *actually* contracted for were the same *actual* services that other plan recordkeepers contracted to deliver at lower fees. [15]  *Ferguson*, 2019 WL 4466714, at *8.  Here, the "baskets of services" are not the same,[16] and importantly, the SAC does not go so far as to suggest that they are, resting instead on alleged similarity in participant number and assets under management. (SAC ¶ 105.)[17]

Finally, for all of the SAC's complaints about information that is not available to participants (nor required to be) (*see, e.g.*, SAC ¶¶ 76-77), the SAC makes no reference to the Plan Recordkeeper agreements that *were* produced to Plaintiffs, as Plaintiffs requested during the January 10, 2023, conference.  The 2018 Fidelity agreement produced to Plaintiffs lists the unique

---

[15] In fact, the NEPC Annual Survey relied on in the SAC (*id.* ¶ 95), indicates that, *inter alia*, "service levels drive meaningful differentiation in [recordkeeping] price."  (Calandra Decl. Ex. 6 at 12).

[16] For example, the Plan's 2018 Recordkeeping Fees included contract administration (code 13), which service was not listed in any of the comparators' Form 5500.  (*Compare* Calandra Ex. 1, Sched. C, *with id.* Exs. 7-13, Sched. C.)  In addition, three of the lowest-cost comparators (Pilgrim's Pride, JBS and Deseret) paid solely for code 64, while the Plan paid also for service codes 13, 37, and 65. (*Id.* Exs. 8-10, Sched. C.)

[17] The SAC's reference to a stipulation entered into by Fidelity regarding the value of its own recordkeeping services provided to its plan participants is irrelevant because the stipulation and SAC are silent as to the "basket of services" provided to Fidelity plan participants.  (SAC ¶¶ 110-11; *see also Wehner v. Genentech, Inc.*, 2021 WL 507599, at *6 (N.D. Cal. Feb. 9, 2021) (rejecting Fidelity stipulation).

services provided to the Plan including, for example, ███████████████ .
(Calandra Decl. Ex. 14, at 42.)  And the January 2022 Fourth Amended Agreement reduced the
Fidelity fee from 3.7 to 2.9 basis points ████████████████████—indicating both
negotiation and the correlation between service levels and fees.  (*Id.* Ex. 15, at 2.)  All of this is
ignored in the SAC and by Plaintiffs' expert.

      In sum, the SAC's apples-to-oranges comparison of recordkeeping fees fails to support an
inference of imprudence.  *See Singh,* 2023 WL 186679 at *5.

    **B.**    **The SAC's Challenge to Eight Investment Options Fails to Create a Plausible Inference of Imprudence**

        1.    No Plausible Inference of Imprudence Can Be Taken From Mere Underperformance

      The test for imprudence under ERISA is one of "arriving at an investment decision, not on
it results." *Ferguson,* 2019 WL 4466714, at *5.  Courts ask not how an investment performed but
"whether a fiduciary employed the appropriate methods to investigate and determine the merits of
a particular investment." *Id.*  ERISA also "does not require clairvoyance" or support "Monday-
morning quarterbacking on the part of lawyers and plan participants . . . who have zeroed in on
underperformance of certain investment options." *Patterson* 2019 WL 4934834, at *17; *Laboy v.
Bd. of Trustees of Bldg. Serv. 32 BJ SRSP*, 513 F. App'x 78, 80 (2d Cir. 2013) ("It is well-
established that allegations of poor results alone do not constitute allegations sufficient to state a
claim for such a breach.").  Rather, a fiduciary's actions are judged "based upon information
available to the fiduciary at the time of each investment decision and not from the vantage point
of hindsight[.]" *St. Vincent*, 712 F.3d at 716.

      The SAC pleads that the five Challenged Performance Funds were underperforming and
"should have been replaced at the beginning of the Class Period or sooner."  (SAC ¶ 131.)  But the
SAC offers only a single snapshot in time as to the funds' performance and, therefore, falls far

short of demonstrating the type of "consistent[] underperform[ance]" that possibly supports an inference of imprudence. *Ferguson*, 2019 WL 4466714, at *9. It also provides no rational basis to infer that information of alleged underperformance was available "at the beginning of the Class Period or sooner." These allegations are the epitome of improper Monday-morning quarterbacking.

The SAC also says nothing about Defendants' process other than a conclusory statement that Defendants must not have followed Modern Portfolio Theory or they would not have selected the Challenged Performance Funds. (SAC ¶ 137.) Notably, Plaintiffs acknowledge that performance must be considered on a "risk adjusted basis" (SAC ¶ 135), but plead no facts to establish that the Challenged Performance Funds and the comparators share similar risk profiles.

In cases similar to this one, courts have not hesitated to dismiss claims that rely on past performance arguments. *See, e.g.*, *Ferguson*, 2019 WL 4466714, at *9 (rejecting comparison to 1-, 3- and 10-year benchmarks because "allegations that certain investment options underperformed as compared to certain benchmarks do not raise a plausible inference that a prudent fiduciary would have found those investments to be 'so plainly risky' to render them imprudent."); *Patterson*, 2019 WL 4934834, at *11 (dismissing claim based on alleged five-year underperformance as "relatively small and certainly not enough to support a claim for breach of the duty of prudence"). The Court should do the same here.

        2.      No Plausible Inference of Imprudence Can be Inferred from Higher Expense Ratios

Plaintiffs also attack Defendants' process with respect to the five Share Class Funds—*i.e.*, those alleged to have a less expensive share class available to the Plan. (SAC ¶ 120). As an initial matter, a fiduciary is under no obligation to select the cheapest possible fund. *Patterson*, 2019

WL 4934834, at *12 ("[T]he existence of a cheaper fund does not mean that a particular fund is too expensive in the market generally or that it is otherwise an imprudent choice").

To avoid this basic tenant of ERISA law, Plaintiffs baldly allege that the more expensive share classes chosen were the "same in every respect other than the price of their less expensive counterparts", and that "the Plan *did not receive any additional services or benefits* based on its use of more expensive share classes; the only consequence was higher costs for the Plan's participants." (*Id.* ¶¶ 122-23.)  But there is no factual support for this conclusory allegation.  To the contrary, Plaintiffs plead (and the Plan's Form 5500 confirms) that the Plan received revenue sharing from 4 of the 5 allegedly more expensive class shares.  *Id.* ¶¶ 93, 120.[18]  The Plan's Form 5500 further explains that such revenue sharing proceeds were credited back to participants investing in the particular funds.  *See supra* n.4.  At least one court has recognized that revenue sharing may be a "plausible inference" for why higher cost share classes are selected.  *Forman v. TriHealth, Inc.*, 40 F.4th 443, 453 (6th Cir. 2022).  Although the *Forman* court was hesitant to find this plausible inference sufficient to justify dismissal, there, unlike here, the benefit of revenue sharing was only a *theory* offered by an amicus.  *Id.*  ("[Defendant] itself has not offered this alternative explanation for its behavior.").  It was not, as it is here, unequivocally demonstrated by documents incorporated by reference in the SAC.  *See Ferguson*, 2019 WL 4466714, at *9 (where "documents properly considered on a motion to dismiss contradict the pleadings, the Court need not accept those pleadings as true").  Thus, contrary to the SAC's conclusory allegation, there is no question that participants received a benefit from the higher cost share classes.  Accordingly,

---

[18] As to the fifth fund, the expense ratio difference with its comparator is a mere 0.03%, hardly a persuasive example of imprudence.  (SAC ¶ 120.)

the five Share Class Funds pose no hurdle to dismissal.[19]  *Twombly*, 550 U.S. at 567 (affirming district court's grant of motion to dismiss where "obvious alternative explanation" for defendant's conduct undermined plausibility of conspiracy claim).

In sum, whether based on the Challenged Performance Funds or the Share Class Funds, Plaintiffs fail to plead a plausible breach of the fiduciary duty of prudence.

## III.   PLAINTIFFS' FAILURE-TO-MONITOR CLAIM MUST FAIL AS WELL

Count II alleges that Montefiore and the Board of Directors failed to monitor the Plan Committee.  (SAC ¶¶ 148-154.)  This claim is derivative of Count I and, accordingly, fails for the same reasons as outlined in the preceding sections.  *See, e.g.*, *Singh*, 2023 WL 186679 at *7; *Cunningham*, 2022 WL 889164, at *6.

## IV.   THE COURT SHOULD STRIKE THE VITAGLIANO EXPERT DECLARATION

In an effort to support its SAC, Plaintiffs attach the declaration of their purported expert, Francis Vitagliano (the "Declaration").  (ECF No. 30-1.)  The Declaration is inappropriate for consideration at the motion to dismiss stage and should be stricken.

While a Court deciding a Rule 12(b)(6) motion may generally consider "written instrument[s] attached to a complaint as an exhibit pursuant to Federal Rule Civil Procedure 10(c),

---

[19] *Sacerdote v. New York University* does not demand a different result.  There, the issue was not whether revenue sharing provided a benefit, but "whether revenue sharing could prudently be achieved with *fewer* retail shares."  *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) ("We have no quarrel with the general concept of using retail shares to fund revenue sharing. But, there was no trial finding that the use here of all 63 retail shares [out of 103 funds] to achieve that goal was not imprudent.").  This case presents a far different picture in that regard, with only five allegedly high-cost share class funds in the Plan.  (SAC ¶ 120.)

and any document incorporated into a complaint by reference," that consideration does not extend to expert opinions. *See, e.g.*, *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 222-23 (S.D.N.Y. 2018) (granting motion to strike expert declaration from the complaint and refusing to consider conclusory allegations based on the declaration). That is because complaint allegations based on expert opinion "contravene proper pleading procedure as governed by Rule 8 of the Federal Rules of Civil Procedure," serve "no permissible purpose in the [] Complaint," and "constitute an attempt to plead additional evidence, the inclusion of which thwarts the purpose of concise, answerable, notice pleading." *Highland Cap. Mgmt., L.P. v. Schneider*, 2004 WL 2029406 at * 4 (S.D.N.Y. Sept. 9, 2004) (denying motion to amend pleading to the extent plaintiff sought to add opinions of expert and attach expert report).

Plaintiffs' repeated citation to the Declaration—no less than twenty times—is an inappropriate attempt to overcome the SAC's deficiencies by masquerading expert opinion as fact. But consideration of such "facts" at the pleading stage would require the Court to adopt untested opinion testimony as true, contravening Rule 8's pleading standard. *See Ong,* 294 F. Supp 3d at 224; *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1212 (D. Kan. 2002) (refusing to consider expert affidavit on motion to dismiss; "[r]ather, the court will merely accept as true all well-pleaded facts[.]").

On top of this, the Declaration would not withstand even the slightest scrutiny or *Daubert* challenge.[20] Courts refuse to consider expert opinions at the pleading stage because of the inherent

---

[20] Mr. Vitagliano's Declaration is replete with errors. By way of example: (1) the chart at paragraph 63 contains incorrect Participant numbers leftover from his use of the nearly identical report in the *Singh* matter; (2) he uses the same erroneous Sanofi per-participant fee described

"evidentiary uncertainty" of such opinions. *Ong,* 294 F. Supp 3d at 224.  Here, absent an order striking the Declaration, the Court will be forced to "confront a myriad of complex evidentiary issues not generally capable of resolution at the pleading stage and might require ruling on the expert's qualifications."  *Id*.  Therefore, the Court should strike the Declaration and disregard all purported "facts" in the SAC that merely parrot Mr. Vitagliano's opinions.

## **CONCLUSION**

For the foregoing reasons, the SAC should be dismissed with prejudice.

---

*supra* at 9-10; and (3) his "Materials Considered" list fails to list the 5500 Forms for the Montefiore Plan, the Sanofi Plan, or the FedEx Plan—despite offering opinions on these plans—but does include the Deloitte 401(k) Plan and others that are vestiges of his *Singh* opinions.

Dated: April 21, 2023    Respectfully submitted,
   New York, NY

By: /s/ John J. Calandra
   Peter John Sacripanti
   John J. Calandra
   Lisa Gerson
   McDermott Will & Emery LLP
   One Vanderbilt Avenue
   New York, New York 10017
   T: 212 547 5400
   F: 212-547-5444

   *Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Complaint complies with the type-volume limitation pursuant to § II.D of the Individual Practices of Judge John G. Koeltl.  The brief contains 6,950 words of Times New Roman 12-point proportional type.

<u>/s/ John J. Calandra</u>