# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| SHEILA A. BOYETTE and TIFFANY JIMINEZ, individually and on behalf of all others similarly situated, | ) ) ) ) | **CIVIL ACTION NO.: 1:22-cv-05280-JGK** |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| MONTEFIORE MEDICAL CENTER, THE BOARD OF TRUSTEES OF MONTEFIORE MEDICAL CENTER, THE TDA PLAN COMMITTEE, DR. MICHAEL STOCKER and JOHN DOES 1-30, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     STANDARD OF REVIEW IN ERISA ACTIONS ..................................................3

III.    STATEMENT OF FACTS ..................................................................................4

        A.      Overview of the Plan ..........................................................................4

        B.      The Totality of the Circumstances Demonstrates that the Plan Fiduciaries Failed
                to Administer the Plan in a Prudent Manner............................................4

                1.      The Plan's Recordkeeping and Administrative Costs Were Excessive
                        During the Class Period ............................................................4

                2.      Failure to Utilize Lower Fee Share Classes ..................................7

                3.      Several of the Funds in the Plan had Lower Cost Better Performing
                        Alternatives in the Same Investment Style ..................................7

IV.     ARGUMENT ...................................................................................................8

        A.      Plaintiffs Have Standing to Challenge Funds In Which They Did Not Personally
                Invest and to Challenge Recordkeeping Fees ..........................................8

        B.      Plaintiffs Plausibly Allege Sufficient Facts that Defendants Breached Their
                Fiduciary Duties in Failing to Monitor the Palan's Recordkeeping Fees..............11

                1.      Purported Inconsequential Factual Errors Stemming from Plaintiffs'
                        Lack of Access to Certain Information Does Not Undermine the SEC ....15

        C.      Fee Related and Performance Comparisons in Plaintiffs' SAC Are Plausibly
                Alleged ...........................................................................................16

        D.      ERISA Requres Selection of Lower-Cost Alternatives When They are Identical
                To Higher-Cost Alternatives..............................................................20

        E.      The Complaint Alleges Sufficient Facts to State a Claim for Failure to Monitor .23

V.      CONCLUSION................................................................................................23

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Moreno v. Deutsche Bank,*
2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016) ............................................................. 21

*Beach v. JPMorgan Chase Bank, N.A.,*
2019 WL 2428631 (S.D.N.Y. June 11, 2019) ............................................................... 9

*Bell v. Pension Comm. of ATH Holding Company, LLC,*
2017 WL 1091248 (S.D. Ind. March 23, 2017) ........................................................... 15

*Braden v. Wal-Mart, Inc.,*
588 F.3d 585 (8th Cir. 2009) ............................................................................. Passim

*Brotherston v. Putnam Investments LLC,*
2016 WL 1397427 (D. Mass. April 7, 2016) .............................................................. 21

*Brown-Davis et al. v. Walgreen Co., et al.,*
2020 WL 8921399 (N.D. Ill. Mar. 16, 2020) .............................................................. 17

*Clark v. Duke University,*
2018 WL 1801946 (M.D.N.C. April 13, 2018) ............................................................. 9

*Cotton v. Altice USA, Inc.,*
2020 WL 32422 (E.D.N.Y. Jan. 2, 2020) ..................................................................... 3

*Cryer v. Franklin Templeton Resources Inc.,*
2017 WL 818788 (N.D. Cal. Jan. 17, 2017) ................................................................ 17

*Cunningham et al. v. Cornell Univ.,*
2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) ..................................................... 2, 3, 19

*Davis v. Salesforce.com,*
2022 WL 1055557 (9th Cir. Apr. 8, 2022) ................................................................. 22

*Davis v. Wash. Univ. in St. Louis,*
960 F.3d 478 (8th Cir. 2020) ................................................................................... 20

*Disselkamp, et al. v. Norton Healthcare, Inc. et al.,*
2019 WL 3536038 (W.D. Ky. Aug. 2, 2019) .............................................................. 21

*Donovan v. Bierwirth,*
680 F. 2d 263 (2d Cir. 1982) ..................................................................................... 1

*Falberg v. Goldman Sachs Group, Inc.*,
2020 WL 3893285 (S.D.N.Y. July 9, 2020) ............................................................ 2

*Forman v. TriHealth, Inc.*,
40 F.4th 443 (6th Cir. 2022) ............................................................ 20

*Gaines v BDO USA*,
Case No. 22 C 1878 (E.D. Ill. Apr. 13, 2021) ............................................................ 18

*Garcia v. Alticor, Inc.*,
No. 1:20-cv-01078-PLM-PJG ............................................................ 18

*George v. Kraft Foods Glob., Inc.*,
641 F.3d 786 (7th Cir. 2011) ............................................................ 14

*Gipson v. Wells Fargo & Co.*,
2009 WL 702004 (D. Minn. Mar. 13, 2009) ............................................................ 21, 23

*Graham v. Fearon*,
721 F. App'x 429 (6th Cir. 2018) ............................................................ 18

*Hughes v. Nw. Univ*,
63 F.4th 615 (7th Cir. 2023)   2, 22

*Hughes v. Northwestern University*,
142 S. Ct. 737 (2022) ............................................................ 14

*Hughes v. Nw. Univ*,
63 F.4th 615 (7th Cir. 2023) ............................................................ 14

*Jenkins, v. Yager et al.*,
444 F.3d 916 (7th Cir. 2006) ............................................................ 20

*Johnson, et al. v. Fujitsu et al.*,
250 F. Supp. 3d 460 (N.D. Cal. 2017) ............................................................ 21

*PNC Fin. Servs. Grp., Inc.*,
2022 WL 973581 (W.D. Pa. Mar. 31, 2022) ............................................................ 13, 19

*Kohari v. MetLife Grp., Inc.*,
21 CIV. 6146 (JPC), 2022 WL 3029328 (S.D.N.Y. Aug. 1, 2022) ............................................................ 17

*Kong v. Trader Joe's Co.*,
No. 20-56415, 2022 WL 1125667 (9th Cir. Apr. 15, 2022) ............................................................ 21

*Krueger v. Ameriprise Fin., Inc.*,
2012 WL 5873825 (D. Minn. Nov. 20, 2012) ............................................................. 21

*Kruger v. Novant Health, Inc.*,
131 F. Supp. 3d 470 (M.D.N.C. 2015) ................................................................ 14, 21

*LaFaro v. N.Y. Cardiothoracic Grp., PLLC*,
570 F.3d 471 (2d Cir. 2009) ................................................................................ 3

*Leber v. Citigroup, Inc.*,
2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) ....................................................... 2, 9

*Long Island Head Start Child Dev. Serv., Inc. v. Econ. Opportunity Comm'n of Nassau County, Inc.*,
710 F.3d 57 (2d Cir. 2013) ................................................................................ 9

*Lutz et al. v. Kaleida Health, et al.*,
2019 WL 3556935 (W.D.N.Y. Aug. 5, 2019) ...................................................... 2

*Main, v. American Airlines*,
248 F. Supp. 3d 786 (N.D. Tex. Mar. 31, 2017) ................................................ 17

*Massachusetts v EPA*,
549 U.S. 497 (2007) ........................................................................................ 10

*Meiners v. Wells Fargo & Co.*,
898 F.3d 820 (8th Cir. 2018) ........................................................................... 16

*Miller v. Astellas US LLC*,
No. 20 C 3882, 2021 WL 1387948 (N.D. Ill. Apr. 13, 2021) .............................. 17

*Moitoso et al. v. FMR, et al.*,
451 F.Supp.3d 189 (D.Mass. 2020) ................................................................ 5, 12

*Moitoso et al. v. FMR, et al.*,
No. 1:18-cv-12122-WGY ................................................................................ 5

*Moreno v. Deutsche Bank Ams. Holding Corp.*,
2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016) ................................................... 2, 23

*New Orleans Employers Int'l Longshoremen's Ass'n, AFL-CIO Pension Fund v. Mercer Inv. Consultants*,
635 F. Supp. 2d 1351 (N.D. Ga. 2009) ............................................................ 19

*Nicolas v. Trustees of Princeton Univ.*,
No. 17- 3695, 2017 WL 4455897 (D.N.J. Sept. 25, 2017) ................................. 17

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Medical Centers Retirement Plan v. Morgan Stanley Investment Management, Inc.*,
712 F.3d 705 (2d Cir. 2013) ("*PBGC*") ................................................................. 3, 15

*Perkins v. United Surgical Partners Int'l Inc.*,
No. 3:21-cv-973, 2022 WL 824839 (N.D. Tex. Mar. 18, 2022) ................................... 10

*Pinnell v. Teva Pharms, USA, Inc.*,
2020 WL 1531870 (E.D. Pa. Mar. 31, 2020) ........................................................... 15

*Sacerdote v. New York Univ.*,
2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) ......................................................... 19

*Sacerdote v. N.Y. Univ.*,
9 F.4th 95, 108 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022) .................... 20, 21, 22, 23

*Sandoval v. Exela Enterprise Solutions, Inc., et al.*,
No. 3:17cv1573 (D. Conn. Mar. 30, 2020) ............................................................... 2

*Severstal Wheeling v. WPN Corporation*,
659 Fed.Appx. 24 (2nd Cir. 2016) ........................................................................... 1

*Short v. Brown U.*,
320 F. Supp. 3d 363 (D.R.I. July 11, 2018) ............................................................. 14

*Silva v. Evonik Corp.*,
2020 U.S. Dist. LEXIS 250206 (D.N.J. Dec. 30, 2020) ............................................. 15

*Sweda v. Univ. of Pennsylvania*,
923 F.3d 320 (3d Cir. 2019) .................................................................. 3, 11, 20, 22

*Tibble v. Edison Int'l*,
135 S. Ct. 1823 (2015) (*Tibble IV,*) ............................................................... 11, 18

*Tibble v. Edison Int'l*,
729 F.3d 1110 (9th Cir. 2013) ................................................................................ 21

*Tibble v. Edison Int'l*,
2017 WL 3523737 (C.D. Cal. Aug. 16, 2017) ......................................................... 21

*Smith v. VCA, Inc.*,
2022 WL 20371116 (C.D. Cal. Apr. 6, 2022), ........................................................ 13

*Vellali et al. v. Yale Univ.*,
308 F.Supp.3d 673 (D. Conn. Mar. 30, 2018) ........................................................... 2

**Statutes**

29 U.S.C. § 1104(a)(1)(B). ................................................................. 18

29 U.S.C. § 1105(a) ................................................................. 23

29 U.S.C. § 1109................................................................. 8

29 U.S.C. §1132(a)(2)................................................................. 8, 9

29 U.S.C. § 1132(d)(1) ................................................................. 1

**Other Sources**

*Assembling a Robust Investment Policy Statement for Endowments and Foundations*, The PNC Financial Services Group, Inc., Jan. 8, 2020 ................................................................. 19

The Employee Retirement Income Security Act of 1974 ................................................................. 1

## I.   INTRODUCTION

Under the Employee Retirement Income Security Act of 1974 ("ERISA"), fiduciaries are held to a standard that is the "highest known to law."[1]  In this case, the Defendant-fiduciaries,[2] *inter alia*, saddled the Montefiore Medical Center 403(b) Plan (the "Plan"),[3] participants with unreasonably high prices for Plan recordkeeping services and selected a slate of investment options for the Plan that were imprudent due to their high fees where identical or nearly identical alternative funds were available in the marketplace. Additionally, Defendants failed to offer available identical lower-cost alternatives to the Plan's investments.

The Second Amended Complaint ("SAC") alleges the same type of circumstantial facts to support a plausible claim for excessive recordkeeping costs that other courts within the Second Circuit and from around the country have also upheld similar allegations.  Indeed, while a minority of decisions within the Second Circuit have granted motions to dismiss in whole or in part, the overwhelming majority of judges within the Second Circuit have upheld allegations similar to

---

[1] *Severstal Wheeling v. WPN Corporation*, 659 Fed.Appx. 24 (2nd Cir. 2016) (quoting *Donovan v. Bierwirth*, 680 F. 2d 263, 272 n.8 (2d Cir. 1982)).

[2] "Defendants" refers, *inter alia*, to Montefiore Medical Center ("Montefiore"), The Board of Trustees of Montefiore Medical Center (the "Board"), the TDA Plan Committee, Inc. (the "Committee"), and Dr. Michael Stocker.

[3] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

those pled here.[4] Most notable is the Seventh Circuit's long-awaited decision in *Hughes v. Nw. Univ,* 63 F.4th 615 (7th Cir. 2023) that dispatches much of Defendants' arguments. In particular, the Seventh Circuit upholds similar recordkeeping allegations as alleged here. *Hughes* also rightly recognized that Plaintiffs' lower share class claims are similar to those that have been upheld by "[f]ive other circuits." *Id.* at 636.

Importantly, Defendants offer their own version of facts throughout their brief, which is inappropriate at the *pleadings* stage where the Court must view the allegations in the light most favorable to Plaintiffs. Additionally, Defendants' attack of Mr. Vitagliano's declaration is of no moment. Defs. Mem. at 121-23. Mr. Vitagliano's declaration simply confirms the substance of Plaintiffs' allegations. It is simply another reason why the Court must view the Complaints' allegations in the light most favorable to Plaintiffs. Additionally, Plaintiffs have established individual standing with respect to their investments in the Plan that were subject to recordkeeping fees, which confers upon them standing to "seek relief… that sweeps beyond [their] own injury." *Braden v. Wal-Mart, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009).

For these and other reasons set forth below, Defendants' motion should be denied.

---

4    *Falberg v. Goldman Sachs Group, Inc.,* 2020 WL 3893285, at * 11 (S.D.N.Y. July 9, 2020) (upholding excessive fee claim); *Sandoval v. Exela Enterprise Solutions, Inc., et al.*, No. 3:17cv1573, slip op. at 8 (D. Conn. Mar. 30, 2020) (same) (attached to Gyandoh Decl. as Ex. 3); *Lutz et al. v. Kaleida Health, et al.*, 2019 WL 3556935, at * 5 (W.D.N.Y. Aug. 5, 2019) (same); *Vellali et al. v. Yale Univ.*, 308 F.Supp.3d 673, 686 (D. Conn. Mar. 30, 2018) ( same); *Cunningham et al. v. Cornell Univ.*, 2017 WL 4358769, at * 8 (S.D.N.Y. Sept. 29, 2017) (same); *Moreno v. Deutsche Bank Ams. Holding Corp.*, at * 6, 2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016) (same); *Leber v. Citigroup, Inc.*, 2010 WL 935442, at * 13 (S.D.N.Y. Mar. 16, 2010) (same).

## II.    STANDARD OF REVIEW IN ERISA ACTIONS

When considering a motion to dismiss, "the Court must 'accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor.'" *Cotton v. Altice USA, Inc.*, 2020 WL 32422, *2 (E.D.N.Y. Jan. 2, 2020) (citing *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 472 (2d Cir. 2009)). Of particular importance here, claims advanced under ERISA, "may survive a motion to dismiss – even absent allegations relating directly to the methods employed by the ERISA fiduciary – if the complaint 'allege[s] facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident.'" *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Medical Centers Retirement Plan v. Morgan Stanley Investment Management, Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) ("*PBGC*"). The reason is simple. Plaintiffs "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).[5]   At the motion to dismiss stage, a "complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Id.* at 594.[6]

## III.   STATEMENT OF FACTS

---

[5] Defendants ask this Court to take judicial notice of documents, which they submitted as exhibits along with their Motion to Dismiss. The exhibits include non-publicly available documents, but a court may only "judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." "However, these documents may only be considered for the fact that they contain a statement therein but not to prove the truth of the statement." *Cunningham*, 2017 WL 4358769, at * 4.

[6] *See also Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 331 (3d Cir. 2019).

3

A.      Overview of the Plan

During the putative Class Period (June 22, 2016, through the date of judgment), the Plan has had at least $1.5 billion dollars in assets under management. ¶ 9.  At all times during the Class Period, the Plan had at least 22,000 participants and over $2 billion dollars in assets under management.

B.  The Totality of the Circumstances Demonstrates that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

In an attempt to discover the details of the Plan's mismanagement, on December 17, 2020, the Plaintiffs wrote to Montefiore requesting, *inter alia*, meeting minutes from the Committee. By Letter dated, January 12, 2021, Montefiore denied Plaintiffs' request for these meeting minutes.  ¶ 82.  Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process, but in most cases, even that is not enough. ¶ 83.

1.   The Plan's Recordkeeping and Administrative Costs Were Excessive During the Class Period

Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost. Vitagliano Decl., ¶¶ 28-35.  SAC ¶ 65. Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. Vitagliano Decl., ¶¶ 29, 33 and 35. SAC ¶ 65.  The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services. Vitagliano Decl., ¶ 29 SAC ¶ 68.  The cost of providing recordkeeping services often depends on the number of participants in a plan. SAC ¶ 69.  "Accordingly, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee." Vitagliano Decl., ¶ 23. SAC ¶ 69.  "Recordkeeping and annual account administration add no monetary value to the

4

account and act solely as a necessary expense decreasing investment returns. There is no rational economic reason for the record keeper, or account administrator to receive increased revenues simply based upon increased investment returns, and increased account balances, or employee additional retirement savings' contributions." Vitagliano Decl., ¶ 34. SAC ¶ 73.

Here, the Plan used a combination of a flat recordkeeping charge paid by participants with revenue sharing used to potentially cover additional fees resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees. ¶ 96. Even when removing all revenue sharing from the Defendants' RKA fees, As demonstrated in the charts in the SAC, the Plan's per participant administrative and recordkeeping fees were significantly above market rates, ranging from $136.51 per participant in 2017 to $172.70 per participant in 2020. ¶ 99.

Looking at RKA costs for other plans of a similar size shows that the Plan was paying higher RKA fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding RKA fees. This is significant because the larger the number of participants, the lesser the per participant RKA costs should be because of the economies of scale. ¶ 106 (listing and referring to comparator plans of similar or smaller size paying less in fees). Furthermore, one of the Recordkeepers throughout the Class Period was Fidelity. ¶ 109. In a recent lawsuit where Fidelity's multi-billion dollar plan with over 15,000 participants was sued, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020). ¶ 110. In *Moitoso*, Fidelity stipulated "The Plan did not receive any broader or more valuable recordkeeping services from

Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period" (November 18, 2014, to the present). No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2. This admission by Fidelity pertained to a plan Fidelity was providing services for *at the same time* it was providing services to the Plan. ¶ 90, 91. Thus, the Plan, with over 22,000 participants and over $3.4 billion dollars in assets in 2020, should have been able to negotiate a recordkeeping cost anywhere from $14 per participant to the mid-$20 range.  ¶ 107.

Another piece of data that underscores the unreasonableness of the RKA costs in this case is data released by NEPC, a consulting group. In its 15th Annual Survey titled the NEPC 2020 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees, the NEPC analyzed the prudence of offering administration and recordkeeping as a percentage of assets. The NEPC study found that the median plan with over 15,000 participants paid no more than .04% of plan assets. In other words, the Plan was paying 217% more than the median Plan in the study. ¶ 108.

Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans by conducting a Request for Proposal ("RFP") in a prudent manner to determine if RKA expenses appear high in relation to the general marketplace. ¶ 78.  The fact that the Plan paid astronomical amounts for recordkeeping during the Class Period, there is little to suggest that Defendants conducted a RFP at reasonable intervals – or even an effective, prudent one - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers. ¶ 91.

### 2.   Failure to Utilize Lower Fee Share Classes

Another indication of Defendants' flawed Plan expense monitoring process is the Defendants' failure to identify and utilize available lower-cost share classes of many of the funds in the Plan during the Class Period. ¶ 114.  Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally 1 million or more, and therefore greater bargaining power. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager. ¶ 115.

As demonstrated by the chart in paragraph 120 of the SAC, in several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's funds. ¶ 120.  Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with their service providers to obtain better pricing, or they were asleep at the wheel and were not paying attention. Either reason is inexcusable. ¶ 128.

### 3.   Several of the Funds in the Plan had Lower Cost Better Performing Alternatives in the Same Investment Style

The Plan failed to replace several of the higher cost and underperforming funds which in 2020 housed over $420 million dollars in participant assets. These funds had nearly identical lower cost alternatives during the Class Period. ¶ 130.  Here, the performance of the managers of these funds fell well short of acceptable industry standards and they should have been replaced at the beginning of the Class Period or sooner.  Failure to do so cost the Plan and its participants millions of dollars in lost opportunity and revenue. ¶ 131.  There were, at least, hundreds of superior

performing less expensive alternatives available during the Class Period one of which should have been selected by the Plan. ¶ 132.

The chart in paragraph 133 if the SAC choses one of these superior performing alternatives out of the hundreds available for each fund and compares them to the underperforming funds currently in the Plan ¶ 133.  Not only are the fees excessive as compared to the similar lower cost alternatives discussed above but the suggested alternative funds outperformed all of the funds significantly.  The difference between the excessive fees paid for these underperforming funds and the suggested alternatives represent more lost savings each year for plan participants and have been compounded over the years. ¶ 133.  The underperformance of these funds as compared to the suggested alternatives is also represented in the chart in paragraph 134 of the SAC, where the funds and the alternative funds were compared to benchmarks relative to a three- and five-year period. ¶ 133.   Had MPT theory or a nearly identical methodology been properly utilized these funds would not have been selected. ¶ 138.   A prudent fiduciary should have been aware of these better preforming lower cost alternatives and switched to them at the beginning of the Class Period. Failure to do so is a clear indication that the Plan lacked any prudent process whatsoever for monitoring the cost and performance of the funds in the Plan. ¶ 138.

## IV.   ARGUMENT

### A. Plaintiffs Have Standing to Challenge Funds In Which They Did Not Personally Invest and to Challenge Recordkeeping Fees.

Defendants' standing argument, Defs. Mem. at 12, ignores the fundamental character of ERISA breach of fiduciary duty claims; particularly, that a suit under 29 U.S.C. §1132(a)(2) is "brought in a representative capacity on behalf of the plan as a whole," and remedies under §1109 "protect the entire plan." *Braden*, 588 F.3d at 593 ("[a]lthough in certain types of matters, courts have found that a plaintiff cannot suffer an injury from an investment that he or she did not

purchase, 'courts have declined to apply the above bright-line rule when addressing ERISA claims for breach of fiduciary duties.'") (citation omitted). Thus, plaintiffs in an ERISA case like this one may seek recovery on behalf of the ***entire plan***, even if they did not personally invest in every one of the funds that caused injury.

Defendants do not dispute that Plaintiffs invested in the plan, *see* Defs. Mem. at 9, but argue that Plaintiffs don't have standing to challenge funds only the related to funds in the Plan that Plaintiffs did not personally hold in their Plan accounts. This argument is meritless because "[i]n this Circuit, plaintiffs do not need to point to individualized injuries with respect to each Plan investment in order to establish constitutional standing in a derivative suit brought pursuant to 29 U.S.C. § 1132(a)(2)." *Leber v. Citigroup, Inc.,* 323 F.R.D. at 155 (citing *Long Island Head Start Child Dev. Serv., Inc. v. Econ. Opportunity Comm'n of Nassau County, Inc.*, 710 F.3d 57, 67 n.5 (2d Cir. 2013)). Defendants ignore *Long Island Head Start*, under which this Court found in *Beach v. JPMorgan Chase Bank*, *N.A.*, 2019 WL 2428631, at *4 (S.D.N.Y. June 11, 2019), that "[p]laintiffs have standing to challenge Defendants' conduct with respect to all the subject funds." As in *Beach*, Defendants here "provide no convincing reason why *Long Island Head Start* does not govern here." Indeed, Defendants acknowledge the overwhelming majority of courts have rejected their standing argument. *See* Defs. Mem. at 10.

Plaintiffs allege the *process* utilized by Defendants resulted in the selection of several imprudent funds, including ones invested in by Plaintiffs. ¶ 71. So, here the ultimate recovery received by Plan participants depends on "how well the trust is managed" and thus confers standing on Plaintiffs to bring suit to challenge Defendants' fiduciary process. For these reasons, Defendants standing argument fails.

Defendants' argument that Plaintiffs lack standing to challenge the Plans' Recordkeeping Fees fails for the same reasons. Plaintiffs allege the *process* utilized by Defendants resulted in the Excessive Recordkeeping fees. ¶144. As alleged in the SAC, the Plaintiffs invested in funds that were "subject to the same excessive asset-based charge applied to all funds in the Plan which was in turn used to pay for the excessive maintenance and monitoring fees on all the underperforming and overly expensive funds in the Plan." ¶¶ 20-21.[7]  Therefore, Plaintiffs have standing to challenge the Defendants process which resulted in exorbitant recordkeeping fees on behalf of the Plan.

### B. Plaintiffs Plausibly Allege Sufficient Facts that Defendants Breached Their Fiduciary Duties in Failing to Monitor the Plan's Recordkeeping Fees

Defendants' arguments concerning the Plan's excessive recordkeeping fees lack merit. As an initial matter, "[m]any allegations concerning fiduciary conduct, such as reasonableness of 'compensation for services' are 'inherently factual question[s]' for which neither ERISA nor the Department of Labor give specific guidance." *Sweda*, 923 F.3d at 329. Under ERISA, "[f]iduciaries must [] understand and monitor plan expenses" because "'[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan,' *Tibble IV*, 135 S.Ct. at 1826, by decreasing its immediate value, and

---

[7] Defendants cite *Perkins v. United Surgical Partners Int'l Inc.*, No. 3:21-cv-973, 2022 WL 824839, at *4 (N.D. Tex. Mar. 18, 2022) as dismissing claim for lack of standing where "plaintiffs make no allegations that the revenue sharing fees are charged to all participants, regardless of which funds the plaintiffs invested in," but that is irrelevant because Plaintiffs allege that the Defendants' recordkeeping fees were charged to all funds. ¶¶ 20-21.

by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328.

Defendants' argument that Plaintiffs' comparator plans, which use a per-participant fee structure, are not comparable to the Plan because the Plan uses an asset-based fee structure demonstrates a complete lack of understanding of Plaintiffs' recordkeeping claims.  Plaintiffs allege in the SAC that there is no rational reason for recordkeeping fees to be tied to Plans assets because "[r]ecordkeeping and annual account administration add no monetary value to the account and act solely as a necessary expense decreasing investment returns." SAC ¶ 73.  If left unchecked, asset-based recordkeeping fees are "a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down." SAC ¶ 75.  Instead, as alleged in the SAC, many large plans used a per-participant fee structure which allows them to use their economy of scale to negotiate a lower per-participant fee. SAC ¶ 69.  Here, Plaintiffs' claim that based on the Plan's large participant size, the Defendants "should have been able to negotiate a recordkeeping cost anywhere in the mid-$20 range per participant from the beginning of the Class Period to the present. Smaller plans were paying an outlier amount of $35 to $36 meaning the Plan with its significant number of participants should have been paying much less than $35 to $36 per participant for RKA fees." SAC ¶ 107.  To support this claim, Plaintiffs offer examples of 15 different large plans that were able to use their participant size to negotiate significantly lower recordkeeping fees than the Plan. SAC ¶ 106.  The per-participant recordkeeping fees in the comparator plans ranged from $23-$38.44 per participant. By comparison, even when factoring in the Plan's revenue sharing, between 2018 and 2020 the Plan's per participant recordkeeping fees ranged from $136.51 to $172.70 per participant.  SAC ¶ 99.

It makes no sense to argue that asset-based recordkeeping fees can't be compared to per-participant recordkeeping fees when Plaintiffs' argument is that Defendants' use of an asset-based

recordkeeping fee structure was a factor that led to the Defendants' mismanagement of the Plan's excessive recordkeeping fees. Had the Defendants utilized a per-participant fee structure, the Defendants would have been able to utilize its plan size to negotiate reasonable recordkeeping fees, like in the comparator plans.  Defendants cite no case law, nor can they, for their position that comparing a Plan with an asset-based fee structure to Plan with per-participation fee structure constitutes a "apple-to-oranges" comparison.

Instead, Plaintiffs' comparator plans constitute a proper "apples-to-apples" comparison because the comparator plans were selected based on the most important factor in determining recordkeeping costs – plan participant size. As alleged in the SAC, there are essential recordkeeping services provided by all national recordkeepers for large plans.  SAC ¶ 66.  "The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services. Vitagliano Decl., ¶ 29" SAC ¶ 68.  Instead, the cost of recordkeeping services depends on plan size because plans with large number of participants can take advantage of their size to negotiate a lower per-participant fee for these basic and fungible services. SAC ¶ 69.

Defendants' argument that "[t]he contention that similar size is dubious" because the Plan had more participants than any of the comparator plans once again demonstrates Defendants' lack of understanding of Plaintiffs' claims. Def. Mem. n.16.  Plaintiffs allege that a plan with more participants has **greater** leverage to use its plan size to negotiate lower per participant recordkeeping fees. Therefore, because the Plan had more participants than any of the comparator plans, the Defendants had greater leverage than any of the comparator plans to negotiate lower per-participant recordkeeping fees. The comparator plans were specifically selected because they were large plans with over 15,000 participants, but smaller than the Plan to show they had less leverage than the Plan to negotiate their significantly lower per-participant recordkeeping fees. These allegations add up to a plausible claim for fiduciary failures. *See, e.g., Johnson v. PNC Fin. Servs. Grp., Inc.*, 2022 WL 973581, at *6 (W.D.

Pa. Mar. 31, 2022) (upholding recordkeeping fee claims when "Plaintiffs allege that the Plan's average per participant, per year recordkeeping fee of $52.58 is "unreasonable and excessive relative to the services received[,]" especially when compared to the four other 401(k) plans noted within the Plaintiffs' benchmark table."); *Smith v. VCA, Inc.*, 2022 WL 2037116, at *4 (C.D. Cal. Apr. 6, 2022) (denying motion to dismiss recordkeeping fee claim when, "In defense of their position that such a fee is unreasonable, Plaintiffs provide a table of 'per participant retirement plan service fees' for other comparable plans with similar numbers of participants. *Id.* ¶ 129. The table at Plaintiffs' Complaint ¶ 129 indicates that Plaintiffs' alleged comparable plans have recordkeeping services fees between $28 to $49."); *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020) ("parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper.").

Plaintiffs' Recordkeeping Claims as alleged in the Amended Complaint easily satisfies the pleadings requirement of every circuit court in the country that has examined this issue since the Supreme Court's opinion in *Hughes v. Northwestern University*, 142 S. Ct. 737 (2022).  The Seventh Circuit recently decided *Hughes v. North-western University* on remand from the Supreme Court. *Hughes v. Nw. Univ,* 63 F.4th 615 (7th Cir. 2023). In *Hughes*, the court held that Plaintiffs properly alleged that "fees were excessive relative to the recordkeeping services rendered" because the plaintiffs alleged, "'[t]here are numerous recordkeepers in the marketplace who are *equally* capable of providing a high level of service to large defined contribution plans like the Plans'" and, "recordkeeping services are 'commoditized ... recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the

business, particularly for jumbo plans like the Plans.'" Here, as stated above, that's exactly what the SAC alleges.

Furthermore, Defendants don't even attempt to address Plaintiffs' additional argument that Defendants breached their fiduciary duties with regard to Recordkeeping fees by failing to remain informed about overall trends in the marketplace regarding the fees being paid by other plans, which includes conducting a Request for Proposal ("RFP") process at reasonable intervals. SAC ¶ 78. Plaintiffs RFP claim provides an independent basis for alleging Defendants failed in their fiduciary duties with regard their Recordkeeping fees. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015). Cerulli Associates stated in 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." SAC ¶ 79. These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper." *Id.* Sending out an RFP would have allowed Defendants to determine whether they were obtaining the best rates from their current recordkeeper, but it appears that they failed to do so.. *Bell*, 2017 WL 1091248, at *5 (finding "that Plaintiffs were not required to allege that the recordkeeping fees were the result of any type of self-dealing, but were required to assert only that Defendants failed to act with prudence under § 1104 when failing to solicit bids and to monitor and control recordkeeping fees."); *Short v. Brown U.*, 320 F. Supp. 3d 363, 370 (D.R.I. July 11, 2018) ("Plaintiffs' claim that a prudent fiduciary in like circumstances would have solicited competitive bids plausibly alleges a breach of the duty of prudence.").

1.  **Purported Inconsequential Factual Errors Stemming from Plaintiffs' Lack of Access to Certain Information Does Not Undermine the SEC**

Defendants misrepresent the law in asserting that a complaint which purportedly misreports exact fees about plan funds must be dismissed.  Defs. Mem. at 15.  The crux of this case is that Defendants engaged in an imprudent process to evaluate fees charged to Plan participants.[8]  Such a claim "may survive a motion to dismiss-even absent any well-pleaded factual allegations relating directly to the methods employed by the ERISA fiduciary…." *PBGC*, 712 F.3d at 718.  As widely recognized, Plaintiffs "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Id.* at 718 (quoting *Braden*, 588 F.3d at 598).  Moreover, the only "fee" amount Defendants argue Plaintiffs got wrong are the fees associated with the Plan's recordkeeper.  Defs. Mem. at 12.

To the extent that Plaintiffs made any errors of fact regarding the recordkeeping fee amounts, it was due to Defendants' opaque and contradictory reporting of Plan data in the Plan's publicly filed form 5500s.  In *Silva v. Evonik Corp.,* 2020 WL 12574912 (D. N.J. Dec. 30, 2020), "the Court conclude[d] that any 'initial miscalculation based on lack of information' does not appear to be significant enough to thwart Plaintiffs' claim at the pleading stage…." *Id.* at *9 (citation omitted).  *See also Pinnell v. Teva Pharms. USA, Inc.*, 2020 WL 1531870, at *6 (E.D. Pa. Mar. 31, 2020). ("The participants also alleged excessive recordkeeping fees, a plausible allegation despite the participants' initial miscalculation based on lack of information.").  Such matters are better suited for resolution in discovery.

C.  **Fee-Related and Performance Comparisons in Plaintiffs' SAC Are Plausibly Alleged**

---

[8] *See* Evonik at 5 ("The Court must ultimately assess whether the Investment Committee breached its duty of prudence by looking to its 'process rather than results' and inquiring whether it 'employed the appropriate methods to investigate and determine the merits of a particular investment.'") (citations omitted).

Defendants once again misrepresent Plaintiffs' claims by arguing Plaintiffs' claims are about "mere underperformance" and in arguing Plaintiffs' claims are based on hindsight "Monday-morning quarterbacking." Defs. Mem. at 18-19. Plaintiffs' claims are not that certain funds simply "underperformed"; Plaintiffs' claims are that the funds underperformed significantly compared to "nearly identical lower cost alternatives during the Class period." SAC ¶ 130. Paragraphs 133 and 134 of the SAC compare the Plan's investments with other "nearly identical superior performing lower cost" investments "in the same investment style" to the same benchmarks thus offering a meaningful comparison. SAC ¶ 130. Through this comparison, Plaintiffs plausibly allege that comparable investments would have yielded better results for Plan participants because of their lower fees. Not only are the fees excessive as compared to the similar lower cost alternatives discussed above, but the suggested alternative funds outperformed all of the funds significantly. ¶ 134.

Defendants' claim that Plaintiffs "plead no facts the Challenged Performance Funds and the comparators share similar risk profiles," but that is simply not the case. The alternatives proposed are in the same investment style and are "nearly identical lower cost alternatives," thereby "provid[ing] a sound basis for comparison—a meaningful benchmark" as the Eighth Circuit stated in *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018) (noting the plaintiff in *Braden* alleged, *inter alia*, the market index). The funds were also compared to benchmarks which "are chosen from funds that meet two criteria. First, the benchmark must be similar to the in the Plan in that a returns-based correlation between the fund in the Plan and all other funds in the third party administrator ("TPA") universe calculated as a standard Pearson product-moment correlation coefficient. Secondly, benchmark funds are compared to the latest positions reported on filings made to the SEC, when available." ¶ 134, n. 18.

The issue of whether the proposed alternatives are in fact comparable is ultimately an issue of fact.  In *Nicolas*, the court remarked that "Defendant raises factual questions about whether the alternative funds Plaintiff suggests … are apt comparisons—and, therefore, whether the underperformance Plaintiff depicts is an accurate portrait ... Such questions do not warrant dismissal—to the contrary, they suggest the need for further information from both parties." 2017 WL 4455897, at * 5; *Cryer v. Franklin Templeton Resources Inc.*, 2017 WL 818788, at *4 (N.D. Cal. Jan. 17, 2017) (same); *see also Main, v. American Airlines,* 248 F. Supp. 3d 786, 794 (N.D. Tex. Mar. 31, 2017) (same); *See also Brown-Davis et al. v. Walgreen Co., et al.*, 2020 WL 8921399, at *2 (N.D. Ill. Mar. 16, 2020) (same); *Miller v. Astellas US LLC*, No. 20 C 3882, 2021 WL 1387948, at *5 (N.D. Ill. Apr. 13, 2021) (same); *Kohari v. MetLife Grp., Inc.*, 21 CIV. 6146 (JPC), 2022 WL 3029328, at *7 (S.D.N.Y. Aug. 1, 2022) (same); *Gaines v BDO USA,* Case No. 22 C 1878 at * 11 (E.D. Ill. Apr. 13, 2021) (same).

Defendants also misrepresent Plaintiffs' complaint by arguing that the Complaint's allegation regarding the Defendants' failure to consider is "the epitome of improper Monday-morning quarterbacking." Def. Mem. at 19.   Plaintiffs' allegations are based on detailed benchmarking and information available to fiduciaries *at the time* of the breaches Plaintiffs allege. Indeed, the Complaint alleges the funds in the Plan underperformed lower cost, better performing alternatives on a trailing in the last three- and five-year annual basis. SAC ¶ 134.  Defendants certainly had access to this information during the Class Period.  The Supreme Court requires fiduciaries to continually monitor investments from the time the investments are selected to every moment during the Class Period. *See Tibble IV*, 135 S. Ct. at 1828. It does not take hindsight for the Plan fiduciaries to recognize selecting more expensive funds over identical or nearly identical cheaper funds – all things being equal – will result in the more expensive funds underperforming.

17

That is exactly what happened in this case.  *See also Garcia v. Alticor, Inc.,* No. 1:20-cv-01078-PLM-PJG, at 13 ("Defendants argue that Plaintiffs cannot bring a "hindsight-based" claim to argue that some funds in the Plan were underperforming. ERISA's prudence standard is based on 'circumstances then prevailing,' so it is true that hindsight-based allegations are improper. 29 U.S.C. § 1104(a)(1)(B); *see also Graham v. Fearon*, 721 F. App'x 429, 437 (6th Cir. 2018). However, Plaintiffs bring allegations that the Committee failed *for years* to perform sufficient reviews or investigations into the Plan's performance. Thus, it is plausible that Defendants had access to performance data at various points throughout the relevant period, and Plaintiffs' allegation is that Defendants did not adequately consider that information.  As plaintiffs allege in the SAC, "A prudent fiduciary should have been aware of these better preforming lower cost alternatives and switched to them at the beginning of the Class period." ¶ 139.  In *Stengl*, the court was unpersuaded by the defendants' hindsight arguments because "Plaintiffs are careful to allege the backward-looking data alone is not the issue but instead that the data is indicative of a flawed process." *Stengl v. L3Harris Techs., Inc.,* 2023 WL 2633333, at *11 (M.D. Fla. Mar. 2, 2023).

Defendants argue the three- and five-year performance periods are too short for benchmarking. Defs. Mem. at 35-36.  The appropriate benchmarking period, however, is a factual dispute that cannot be resolved at this stage.  *See, e.g.*, *Sacerdote v. New York Univ.*, 2017 WL 3701482, at *10 (S.D.N.Y. Aug. 25, 2017).  In any event, industry experts have concluded three- and five-year periods are appropriate because they cover a full market cycle.  *See Assembling a Robust Investment Policy Statement for Endowments and Foundations*, The PNC Financial

Services Group, Inc., Jan. 8, 2020[9] (a "fund's Investment performance should be reviewed regularly, such as on an annual basis; however, the emphasis with regard to performance should be focused on results achieved over a full market cycle (typically a three-to-five year period)"). Longer-term benchmarking can be appropriate if it is the result of a conscious decision.  *See Jenkins, v. Yager et al.,* 444 F.3d 916, at 925 (7th Cir. 2006) (evidence on *summary judgment* showed defendants intentionally pursued "a long-term plan.").  At this stage, Plaintiffs have plausibly pled enough to demonstrate injury from investment in the underperforming funds during the Class Period.

### D.  ERISA Requires Selection of Lower-Cost Alternatives When They are Identical To Higher-Cost Alternatives

Plaintiffs' claim is that Defendants failed to offer available identical lower-cost alternatives to the Plan's investments. The Second Circuit has held that that allegations that defendants offered more expensive mutual funds when less expensive shares of the same funds constitutes a claim for breach of the duty of prudence. See *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 108 (2d Cir. 2021). ("[W]ith respect to the share-class allegations, we believe that plaintiffs have sufficiently alleged that NYU acted imprudently in offering the number of retail-class shares identified in the complaint.")   The Second Circuit's position is consistent with Circuit Courts throughout the

---

[9] *see also Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *13 (S.D.N.Y. Sept. 27, 2019) (advisor satisfied fiduciary duty where it regularly presented "three and five-year benchmarks" of investment options); *New Orleans Employers Int'l Longshoremen's Ass'n, AFL-CIO Pension Fund v. Mercer Inv. Consultants*, 635 F. Supp. 2d 1351, 1361 (N.D. Ga. 2009) (no breach of fiduciary duties where advisor regularly presented performance benchmarked to "one, three and five year periods").

country. *See Forman v. TriHealth, Inc.*, 40 F.4th 443, 450 (6th Cir. 2022) (holding that defendants offered "pricier retail shares of mutual funds when those same investment management companies offered less expensive institutional shares of the same funds" state a clam for breach of the duty of prudence.) *See also Sweda v. Univ. of Pa.*, 923 F.3d 320, 331 (3d Cir. 2019) (holding that allegations "that despite the availability of low-cost institutional class shares, Penn selected and retained identically managed but higher cost retail class shares" supported a duty of prudence claim); *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020) (holding that the "clearest example" of a breach of the duty of prudence was that "[i]nstead of offering [institutional] shares across [the defendant's] entire lineup, . . . it offered retail shares for funds"); *Kong v. Trader Joe's Co.*, No. 20-56415, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022) ("Defendants . . . failed to monitor and control the offering of a number of mutual funds in the form of 'retail' share classes that carried higher fees than those charged by otherwise identical 'institutional' share classes of the same investments.").[10]

---

[10] See also *Disselkamp, et al. v. Norton Healthcare, Inc. et al.*, 2019 WL 3536038, at * 4 (W.D. Ky. Aug. 2, 2019); *Johnson, et al. v. Fujitsu et al.*, 250 F. Supp. 3d 460, 466-67 (N.D. Cal. 2017); *Tibble v. Edison Int'l*, 729 F.3d 1110, 1137-39 (9th Cir. 2013); *Tibble v. Edison Int'l*, 2017 WL 3523737, at *11-12 (C.D. Cal. Aug. 16, 2017) (same); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 476-78 (M.D.N.C. 2015) (same); *Brotherston v. Putnam Investments LLC*, 2016 WL 1397427, at *1 (D. Mass. April 7, 2016) (same); *Krueger v. Ameriprise Fin., Inc.*, 2012 WL 5873825, at *10-11 (D. Minn. Nov. 20, 2012) (same); *Gipson v. Wells Fargo & Co.*, 2009 WL 702004, at *2 (D. Minn. Mar. 13, 2009) (same); *accord Moreno v. Deutsche Bank*, 2016 WL 5957307, at * 2 (S.D.N.Y. Oct. 13, 2016).

Defendants argue that revenue sharing provides an explanation for the high-cost share class, but this argument at the motion to dismiss state has been squarely rejected in this Circuit and in courts throughout the country. *See Sacerdote* at 108 (holding alternative explanation for offering retail shares "goes to the merits and is misplaced at this early stage.") "To the extent Defendants argue that Plaintiffs must allege additional facts, such as whether the higher cost share class offered any additional benefits, the Court disagrees. Plaintiffs need not 'rule out every possible lawful explanation; for the challenged conduct in the Complaint." *Silva v. Evonik*, No. 20-2202, at n.15 (citing *Sweda*, 923 F.3d at 326). *See also Hughes* at 636. ("Northwestern also contends that retail-class shares are superior to institutional-class shares because their higher fees allow plans, through revenue sharing, to pay for recordkeeping and other administrative expenses…This is just one possible explanation for why Northwestern chose to retain such a large number of retail-class shares.  But this explanation is not so much more obvious than plaintiff's account that this issue can be resolved on the pleadings."); *See also Davis v. Salesforce.com*, 2022 WL 1055557 (9th Cir. Apr. 8, 2022) at *1. (same); *Moreno*, 2016 WL 5957307, at * 6 (finding defendants' offering of their own facts to contest the plausibility of plaintiffs' allegations "raise factual issues that cannot be resolved at the motion to dismiss stage.").

Defendants misstate *Sacerdote* in attempt to distinguish it from the present case. Defendants quote a section of the option stating that the issue in *Sacerdote* was "whether revenue sharing could prudently be achieved with fewer retail shares." Defs. Mem. at n. 19. Defendants take this quote out of context, and it certainly was not the issue in *Sacerdote*. Defendants quote a section of the option where the majority was discussing whether the trial court's error in dismissing of the share-class claim on the pleadings was harmless because the use of revenue sharing was found not imprudent at trial.  Defs. Mem. at n. 19.; *Sacerdote* at 111.   In the section the

Defendants' quoted, the Court was actually saying that the trial court's error in dismissing the retail share claim was not a harmless error because "We do not know, for example, whether revenue sharing could prudently be achieved with fewer retail shares." Defendants quotes from the *Sacerdote* option actually further supports reasons why revenue sharing is not a proper alternative explanation that requires dismissal at the motion to dismiss stage.

**E. The Complaint Alleges Sufficient Facts to State a Claim for Failure to Monitor**

Defendants challenge Plaintiffs' fiduciary breach claims and argue "This claim is derivative of Count I and, accordingly, fails for the same reasons…." Defs. Mem. at 21. Because Plaintiffs have adequately alleged Defendants breached their fiduciary duties under ERISA, Plaintiffs need not allege any further facts for Defendants to be liable for co-fiduciary breaches under 29 U.S.C. § 1105(a).

\*\*\*

Lastly, Defendants' bid to strike the Vitagliano report should be denied as moot given that Mr. Vitagliano's report merely confirms the factual assertions made in the SAC.

**V.    CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss in its entirety and seek leave to amend the Complaint should the Court grant Defendants' motion.

Dated: May 19, 2023                              Respectfully submitted,


                                                 **CAPOZZI ADLER, P.C.**

                                                 */s/ Mark K. Gyandoh*
                                                 Mark K. Gyandoh, Esquire
                                                 (admitted *pro hac vice*)
                                                 312 Old Lancaster Road
                                                 Merion Station, PA 19066

Tel: (610) 890-0200
Fax (717) 233-4103
Email: markg@capozziadler.com

**CAPOZZI ADLER, P.C.**
Donald R. Reavey, Esquire
(admitted *pro hac vice*)
2933 North Front Street
Harrisburg, PA 17110
Tel: (717) 233-4101
Fax (717) 233-4103
Email:  donr@capozziadler.com

*Counsel for Plaintiffs and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2023, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By:   */s/Mark K. Gyandoh*
      Mark K. Gyandoh, Esq

## CERTIFICATE OF WORD COUNT

I hereby certify that this brief complies with the Individual Pracities of the Honorable Judge Koeltl and that this brief does not exceed 6,951 words.

By:   */s/Mark K. Gyandoh*
      Mark K. Gyandoh, Esq