UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────

SHEILA A. BOYETTE and TIFFANY
JIMINEZ, individually and on behalf
of all others similarly situated,                    22-cv-5280 (JGK)

                        Plaintiffs,                   MEMORANDUM OPINION AND
                                                      ORDER
            - against -

MONTEFIORE MEDICAL CENTER, THE BOARD
OF TRUSTEES OF MONTEFIORE MEDICAL
CENTER, THE TDA PLAN COMMITTEE, DR.
MICHAEL STOCKER, and JOHN DOES 1-30,

─────────────────────────────────────
                        Defendants.

JOHN G. KOELTL, District Judge:

        The plaintiffs, Sheila A. Boyette and Tiffany Jiminez, bring

this purported class action on behalf of themselves and all others

similarly situated, against the defendants, Montefiore Medical

Center ("Montefiore"), the Board of Trustees of Montefiore Medical

Center (the "Board"), the TDA Plan Committee (the "Committee"),

Dr. Michael Stocker, and John Does 1-30 (collectively, "the

defendants"). The plaintiffs allege that the defendants violated

their fiduciary duty of prudence in violation of the Employment

Retirement Income Security Act ("ERISA"), 29 U.S.C. 1001 et seq.

        The defendants now move to dismiss various claims for lack of

standing pursuant to Federal Rule of Civil Procedure 12(b)(1), and

for failure to state a claim pursuant to Federal Rule of Civil

Procedure 12(b)(6). For the following reasons, the defendants'

motion to dismiss is **granted**.

**I.**

The following facts are taken from the Second Amended Complaint, ECF No. 30, unless otherwise noted.

**A.**

The plaintiffs are former employees of Montefiore who are participants in the Montefiore Medical Center 403(b) Plan (the "Plan"). Second Am. Compl. ("SAC") ¶¶ 20-21. The Plan covers substantially all eligible employees of Montefiore. Id. ¶¶ 43-44. From 2017 to 2022, the Plan had over 22,000 participants, id. ¶ 11, and at the end of fiscal year 2020, the Plan had over $3.2 billion in assets under management. Id. ¶ 9.

The Plan is a defined contribution plan. Id. ¶ 43. 29 U.S.C. § 1002(34) defines a defined contribution plan as a

> pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

Participants can contribute to their Plan accounts in several different ways, and Montefiore matches participant contributions up to a certain percentage. Id. ¶¶ 45-46.

Plaintiff Sheila A. Boyette invested in the Fidelity Freedom 2030 Fund which was mapped to the Principle Life Time 2030 Inst Fund when the Plan discontinued the Fidelity Freedom Funds. Id. ¶ 20. Plaintiff Tiffany Jiminez invested in the BlackRock LifePath

Index 2045 Fund and the MetLife Blended Fund. Id. ¶ 21. The plaintiffs assert that the substantial amount of assets under the Plan's management places it among the largest plans in the United States, id. ¶¶ 9-10, and that this status affords the Plan substantial bargaining power to negotiate favorable recordkeeping fees and management fees. Id. ¶¶ 12-13.

The Committee is the named fiduciary under the Plan with the responsibility to select and monitor the investment alternatives available for participant-directed investment. Id. ¶ 32. Montefiore, acting through the Board, appointed the Committee to, among other things, ensure that the investments available to Plan participants were appropriate and that the Plan paid a fair price for recordkeeping services. Id. ¶ 28.

Fidelity Investments ("Fidelity") and Principal Financial Group ("Principal") serve as the Plan's recordkeepers. Id. ¶ 88. "Recordkeeping" refers to "the suite of administrative services typically provided to a defined contribution plan by the plan's 'recordkeeper.'" Id. ¶ 64. Recordkeeping expenses "can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing." Id. ¶ 74. The cost of providing recordkeeping services "often depends on the number of participants in a plan," id. ¶ 69, and thus, "[p]lans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping

fee." Id. ¶ 71. While the "vast majority of plans" charge recordkeeping expenses on a per-participant basis, id., the Plan employs an asset-based fee schedule whereby recordkeeping fees are charged as a percentage of each participant's account balance. Id. ¶¶ 20-21, 92.

### B.

The plaintiffs allege that the recordkeeping costs for the Plan were higher than those of comparable peer plans. From 2017 to 2020, the Plan's recordkeeping cost per participant is alleged to have ranged from $136.51 to $230.25 with revenue sharing, and $136.51 to $172.70 without revenue sharing. Id. ¶¶ 98-99. The plaintiffs compare these figures to those of other plans with at least 15,000 participants and $300 million dollars in assets under management, for which the recordkeeping cost per participant allegedly ranged from $23 to $30. Id. ¶ 105. Inferring from these benchmarks, the plaintiffs allege that the Plan "should have been able to negotiate a recordkeeping cost anywhere in the mid $20 range per participant from the beginning of the Class Period to the present." Id. ¶ 107. In addition to comparing the Plan's per-participant recordkeeping fees with those of similarly sized plans, the plaintiffs rely on a stipulation by Fidelity in another case to support their inference that the defendants could have negotiated recordkeeping fees in the range of reasonableness they identify. Id. ¶¶ 109-13.

The plaintiffs allege that part of a fiduciary's duty to remain informed about overall trends in the recordkeeping fee marketplace includes conducting a Request for Proposal ("RFP") process at "reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace." Id. ¶ 78. The plaintiffs allege that, because the Plan "paid astronomical amounts for recordkeeping during the Class Period, there is little to suggest that Defendants conducted an RFP at reasonable intervals . . . to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers." Id. ¶ 91.

In addition to recordkeeping costs, each of the funds offered by the Plan has an associated maintenance and monitoring fee. This fee is referred to as the "expense ratio," and is the amount paid by a plan's participant relative to the percentage of assets held by that participant in the fund. The plaintiffs allege that "a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available. . . . [P]rudent retirement plan fiduciaries will search for and select the lowest-priced share class available." Id. ¶ 117.

The plaintiffs allege two related, but distinct, claims regarding the expense ratios charged against participants'

investments. First, they allege that the Plan failed to "identify and utilize available lower-cost share classes of many of the funds in the Plan." Id. ¶ 114. The plaintiffs identify five funds for which there was a less expensive counterpart.[1] The plaintiffs claim that "the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts," id. ¶ 123, and that "the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for the Plan's participants." Id. ¶ 122. The plaintiffs assert: "A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity," id. ¶ 121. Instead, the plaintiffs contend, the defendants failed to monitor the Plan prudently to determine whether it was invested in the lowest-cost share class available for its funds. Id. ¶ 120.

---

[1] The funds in the Plan are the MFS Value R3, PGIM High Yield Z, Vanguard Total Intl Stock Index Admiral, BNY Mellon International Bond I, and Metropolitan West Total Return Bd I funds. SAC ¶ 120. The corresponding "less expensive share class" funds are the MFS Value R6, PGIM High Yield R6, Vanguard Total Intl Stock Index I, BNY Mellon International Bond Y, and Metropolitan West Total Return Bd Plan funds, respectively. Id.

Second, the plaintiffs allege that the Plan failed to replace "higher cost and underperforming" funds with "superior performing less expensive alternatives." Id. ¶¶ 130, 132. The plaintiffs identify five underperforming funds and compare them to five purportedly lower-cost, better-performing alternatives.[2] Id. ¶ 133. The plaintiffs argue that a prudent fiduciary should have been aware of these alternatives and switched to them at the beginning of the Class Period. "Failure to do so is a clear indication that the Plan lacked any prudent process whatsoever for monitoring the cost and performance of the funds in the Plan." Id. ¶ 139.

## II.

At the outset, the Court notes that it recently dismissed a substantially similar case alleging a breach of the fiduciary duty of prudence in violation of ERISA. See Singh v. Deloitte LLP, 650 F. Supp. 3d 259 (S.D.N.Y. 2023). The plaintiffs in Singh alleged that the retirement plans offered by the defendants were managed imprudently because their recordkeeping fees were excessive in relation to the services rendered, and the expense ratios charged by the plans' funds were unreasonably excessive. Id. at 266-68.

---

[2] The underperforming funds in the Plan are the Janus Henderson Small Cap Value N, PGIM Jennison Growth Z, MFS Value R3, Dodge & Cox International Stock, and BNY Mellon International Bond I funds. Their "superior performing alternatives" are the DFA US Targeted Value I, American Century Investments Focused Dynamic Growth Fund R6 Class, Vanguard Equity-Income Adm, Bridge Builder International Equity, and PIMCO International Bond (Unhedged) Instl funds, respectively. Id. ¶¶ 133-34.

This Court granted the defendants' motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) with respect to a plan in which the plaintiffs did not participate, and with respect to individual funds in which they did not participate. The Court also dismissed the plaintiffs' claims with respect to two funds in which they did participate for failure to state a claim. The plaintiffs have avoided distinguishing <u>Singh</u> in any way, and many of the reasons that required dismissal in <u>Singh</u> require dismissal of this case.

**A.**

When presented with motions under Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction and Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted, the Court should consider the jurisdictional challenge first. See <u>Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n</u>, 896 F.2d 674, 678 (2d Cir. 1990).[3]

The defendants first move to dismiss for lack of subject matter jurisdiction, arguing that the plaintiffs lack standing because the plaintiffs fail to plead that they paid excessive recordkeeping fees and have not alleged participation in the Plan's funds charging allegedly excessive expense ratios. To

---

[3] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

prevail against a motion to dismiss for lack of subject matter
jurisdiction, the plaintiff bears the burden of proving the
Court's jurisdiction by a preponderance of the evidence. Makarova
v. United States, 201 F.3d 110, 113 (2d Cir. 2000). In considering
such a motion, the Court generally must accept the material
factual allegations in the complaint as true. See J.S. ex rel.
N.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004).
However, the Court does not draw all reasonable inferences in the
plaintiff's favor. Id. Indeed, where jurisdictional facts are
disputed, the Court has the power and the obligation to consider
matters outside the pleadings to determine whether jurisdiction
exists. See Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d
Cir. 1986). In so doing, the Court is guided by that body of
decisional law that has developed under Rule 56. See id.

Article III standing requires a party to show that (1) the
party has suffered an actual or imminent injury in fact, which is
concrete and particularized; (2) there is a causal connection
between the injury and conduct complained of; and (3) it is likely
that a favorable decision in the case will redress the injury.
Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992). "The
party invoking federal jurisdiction bears the burden of
establishing these elements." Id. at 561.

**i.**

First, the defendants argue that the plaintiffs lack standing with respect to their claim alleging excessive recordkeeping fees. Injury-in-fact requires the plaintiffs to show that they have suffered an actual or imminent injury that is concrete and particularized as to the plaintiffs. Lujan, 504 U.S. at 560. The plaintiffs, however, fail to plead that they, themselves, paid the excessive fees they allege.

The Plan employs an asset-based recordkeeping fee schedule. SAC ¶¶ 20-21. Thus, recordkeeping fees are charged as a percentage of each participant's account balance and vary by individual. The plaintiffs' argument as to the unreasonableness of the Plan's recordkeeping fees is based on the comparison between what the plaintiffs purport to be the Plan's per-participant fees and a "reasonable" range of fees charged by similarly sized plans. Id. ¶ 105. But this argument fails because the plaintiffs fail to plead the recordkeeping fees each of them actually paid. The actual fees a participant pays will depend on the size of the participant's account -- the smaller the account, the lower the fees. A participant's fees may be well below the range of reasonableness advanced by the plaintiffs, depending on the participant's account balance. The plaintiffs allege that they suffered injury by "continuing to pay [their] share of the overly expensive [recordkeeping] costs through the asset based charge" applied to

their investments, id. ¶¶ 20-21, but without setting forth what they individually paid each year in recordkeeping fees, they cannot allege that the fees they paid were unreasonable or outside the range of reasonableness set forth in the SAC. Because they fail to plead a cognizable injury for Article III standing on their recordkeeping fees claim, the claim must be dismissed.

**ii.**

The plaintiffs also lack standing with respect to their claims challenging the funds that charged excessive expense ratios, because the plaintiffs did not invest in these funds.

In a defined contribution plan such as the one at issue, "a plan participant's benefit is determined entirely by that participant's individual contributions to their own plan and in which the participants direct the investment of their contributions into various investment options offered by the plan." Singh, 650 F. Supp. 3d at 265. It follows, then, that the plaintiffs may not complain about poorly performing funds unless the plaintiffs invested in those funds, because they are not otherwise harmed. Id. ("[A] plan participant who does not invest their plan assets into a particular fund offered in a defined contribution plan will not have their individual plan benefit affected in any way by that fund's performance or associated fees."); see also Taveras v. UBS AG, 612 F. App'x 27, 29 (2d Cir. 2015); In re Omnicom ERISA Litig., No. 20-cv-4141, 2021 WL

3292487, at *9 (S.D.N.Y. Aug. 2, 2021); Patterson v. Morgan
Stanley, No. 16-cv-6568, 2019 WL 4934834, at *5 (S.D.N.Y. Oct. 7,
2019). Neither of the plaintiffs invested in any of the five funds
for which the plaintiffs have alleged that there were available
lower-cost share classes. Compare SAC ¶¶ 20-21, with id. ¶ 120.
Moreover, neither of the plaintiffs invested in the five
underperforming funds that the plaintiffs have identified. Compare
id. ¶¶ 20-21, with id. ¶ 133. Because the plaintiffs have failed
to show that the challenged funds in which they did not invest
caused them any particularized injury, the plaintiffs lack
standing to assert their excessive expense ratio claims.

Therefore, in this case, the plaintiffs lack standing to
assert their claims that they paid excessive recordkeeping
charges. They also lack standing to assert their claims that the
funds in which the Plan invested had excessive expense ratios or
were underperforming funds because the plaintiffs did not invest
in any of those funds. This is sufficient to dismiss the
plaintiffs' complaint. However, for the sake of completeness, the
Court explains why the plaintiffs have also failed to state a
claim pursuant to Rule 12(b)(6).

**B.**

In deciding a Rule 12(b)(6) motion to dismiss, the
allegations in the complaint are accepted as true, and all
reasonable inferences must be drawn in the plaintiffs' favor.

12

McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id. When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

13

**i.**

To state a claim for breach of fiduciary duty under ERISA, the plaintiff must allege that "(1) the defendant was a fiduciary who (2) was acting in a fiduciary capacity, and (3) breached his fiduciary duty." Cunningham v. USI Ins. Servs., LLC, No. 21-cv-1819, 2022 WL 889164, at *2 (S.D.N.Y. Mar. 25, 2022). The defendants do not dispute that they were fiduciaries of the Plan acting in their fiduciary capacity. The defendants claim only that they did not breach their fiduciary duty of prudence to the plaintiffs.

ERISA imposes a duty of prudence upon plan fiduciaries, directing them to make reasonable investment and managerial decisions "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). The duty of prudence "is measured according to the objective prudent person standard developed in the common law of trusts," and a fiduciary's actions are judged "based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight." Pension Benefit Guar. Corp. ex rel. Saint Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 716 (2d Cir. 2013). The focus is "on a fiduciary's conduct in arriving at an investment decision, not on its results, and asks whether a

14

fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." Id. "In other words, courts analyze a fiduciary's process to determine prudence, not outcome." Ferguson v. Ruane Cunniff & Goldfarb Inc., No. 17-cv-6685, 2019 WL 4466714, at *5 (S.D.N.Y. Sept. 18, 2019). Trust law informs the duty of prudence, because "an ERISA fiduciary's duty is derived from the common law of trusts." Tibble v. Edison Int'l, 575 U.S. 523, 528 (2015). Because ERISA's duty of prudence is interpreted according to the common law of trusts, "a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones." Id. at 530. The analysis is "context specific," giving "due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." Hughes v. Nw. Univ., 595 U.S. 170, 177 (2022); see also Singh, 650 F. Supp. 3d at 265-66.

The plaintiffs allege that the recordkeeping fees charged by the Plan were unreasonably excessive, indicating that the Plan was managed imprudently. From 2017 to 2020, the Plan charged recordkeeping fees per-participant in the range of  $136.51 to $230.25 with revenue sharing, and $136.51 to $172.70 without revenue sharing. SAC ¶¶ 98-99. Comparable plans allegedly charged between $23 and $30 in recordkeeping fees per participant. The plaintiffs compare these fee ranges to claim that the Plan fees were "astronomical" and that the Plan "should have been able to

negotiate a recordkeeping cost in the mid $20 range."[4] Id. ¶¶ 99, 107.

However, as this Court found in Singh, the plaintiffs must allege more than that the Plan's recordkeeping fees were higher than those of other plans. 650 F. Supp. 3d at 266. Well-reasoned decisions in this Circuit and elsewhere have found that plaintiffs must plausibly allege that "the administrative fees were excessive relative to the services rendered." Ferguson, 2019 WL 4466714, at *8; Gonzalez v. Northwell Health, Inc., 632 F. Supp. 3d 148, 167 (E.D.N.Y. 2022) ("A plaintiff must plead administrative fees that are excessive in relation to the specific services the recordkeeper provided to the specific plan at issue."); see also Smith v. CommonSpirit Health, 37 F.4th 1160, 1169 (6th Cir. 2022) (same).

The plaintiffs rely on the general assertion that "[n]early all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost." SAC ¶ 65. But "[t]he plaintiffs' allegation that all recordkeepers offer the same range of services does not mean that all plans employing

---

[4] The plaintiffs and the defendants advance different methodologies to calculate the Plan's recordkeeping fees and arrive at different per-participant fees. Compare SAC ¶ 98-99, with Defs.' Mem. of Law in Supp. of Mot. to Dismiss, at 7-10, ECF No. 37. But the methodologies the parties adopt have no bearing on the plaintiffs' failure to plead that these fees were excessive relative to the services rendered.

a particular recordkeeper receive an identical subset of services within that range." Singh, 650 F. Supp. 3d at 267. The plaintiffs have failed to allege with specificity what recordkeeping services the Plan received, nor do they plead that the services provided by the recordkeepers for the comparator plans were the same as those provided by the Plan's recordkeepers. SAC ¶ 88. "Because the plaintiffs' comparison does not compare apples to apples, the comparison fails to indicate plausibly imprudence on the part of the defendants." Singh, 650 F. Supp. 3d at 267; see also Matney v. Barrick Gold of N. Am., 80 F.4th 1136, 1156-58 (10th Cir. 2023) (affirming dismissal of a claim that recordkeeping fees were excessive when the plaintiffs failed to provide meaningful comparisons). This claim is therefore dismissed.

**ii.**

The plaintiffs also allege that the Plan was managed imprudently because the expense ratios charged by the offered funds were excessive, and the Plan failed to "identify and utilize available lower-cost share classes of many of the funds in the Plan." SAC ¶ 114. The plaintiffs identify five funds, each with an "identical counterpart" that has a lower expense ratio. Id. ¶ 120. The plaintiffs allege that the existence of the cheaper share classes implies that the defendants failed to prudently monitor the Plan. Id. This argument fails for similar reasons as the plaintiffs' recordkeeping argument.

17

First, "[t]he existence of a cheaper fund does not mean that a particular fund is too expensive in the market generally or that it is otherwise an imprudent choice." <u>Meiners v. Wells Fargo & Co.</u>, 898 F.3d 820, 823-24 (8th Cir. 2018). The plaintiffs allege that "[t]here is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the same investment" and that "the Plan did not receive any additional services or benefits based on its use of more expensive share classes . . . ." SAC ¶ 122. However, with respect to the allegedly more expensive funds, the Plan's Form 5500s explain that the Plan received revenue sharing from four of the five more expensive class shares and that such proceeds were credited back to participants investing in those funds.[5] Calandra Decl. Ex. 1, at 42, ECF No. 38-1 ("The Plan and Fidelity entered into an agreement whereby Fidelity credits the amount of such revenue sharing payments attributable to the Plan back to the Plan, to then be allocated to eligible participant accounts as soon as administratively feasible after each quarter."). There is no question that the plaintiffs received a benefit from the higher cost share classes. The plaintiffs' contention that the more expensive share classes "were the same in every respect other than price to their less expensive counterparts" is unavailing and

---

[5] The expense ratio difference for the fifth fund is a mere 0.03%. SAC ¶ 120.

insufficient to plead a plausible breach of the fiduciary duty of
prudence.

**iii.**

The plaintiffs' claim concerning the Plan's failure to
replace low-performing, higher-cost funds with superior-
performing, lower-cost alternatives also fails. "It is well-
established that allegations of poor results alone do not
constitute allegations sufficient to state a claim for such a
breach." Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP, 513 F.
App'x 78, 80 (2d Cir. 2013). Further, ERISA "does not require
clairvoyance" or support "Monday-morning quarter-backing on the
part of lawyers and plan participants who, with the benefit of
hindsight, have zeroed in on the underperformance of certain
investment options." Patterson, 2019 WL 4934834, at *17. The
plaintiffs plead that the underperforming funds "should have been
replaced at the beginning of the Class Period or sooner," SAC ¶
131, but fail to provide any basis beyond underperformance from
which imprudence can allegedly be inferred. Indeed, the Second
Amended Complaint offers only a single snapshot in time as to the
funds' performance and does not offer any grounds to infer that
the information concerning the alleged underperformance was
available to the fiduciaries at the beginning of the Class Period
or sooner. See Defs.' Mem. of Law in Supp. of Mot. to Dismiss, at
18-19. Without pleading facts indicating additional indicia of

19

imprudence, the plaintiffs have not alleged plausibly that the
Plan fiduciaries breached their duty of prudence with respect to
the underperforming funds.

**iv.**

The plaintiffs also bring a claim for a failure to monitor.
This claim is derivative of the plaintiffs' claims for a breach of
fiduciary duty. Because the plaintiffs have insufficiently pleaded
their claims for a breach of fiduciary duty, the defendants'
motion to dismiss the derivative claim for failure to monitor is
likewise **granted**. See Coulter v. Morgan Stanley & Co., 753 F.3d
361, 368 (2d Cir. 2014) (finding that failure to monitor claims
"cannot survive absent a viable claim for breach of a duty of
prudence"); Singh, 650 F. Supp. 3d at 269.

**v.**

The plaintiffs attempt to bolster their allegations with the
declaration of Francis Vitagliano, an "expert with 35 years of
experience in the record keeping and administration business and
the related asset management processing." SAC ¶ 102. In the
declaration, Mr. Vitagliano opines that based on his experience
and an analysis of the relevant factors, "the Plan should have
been able to obtain per participant recordkeeping fees of $23-
$26." Ex. 1, at ¶ 47, ECF No. 30-1 ("Vitagliano Decl.").

But the plaintiffs' reliance on an expert declaration at the
motion to dismiss stage is improper. See Singh, No. 21-cv-8458,

2023 WL 4350650, at *5-6 (S.D.N.Y. July 5, 2023) ("The plaintiffs'
reliance on an expert declaration at the motion to dismiss stage
is improper."). Federal Rule of Civil Procedure 10(c) provides
that "[a] copy of a written instrument that is an exhibit to a
pleading is a part of the pleading for all purposes." "A written
instrument is a legal document that defines rights, duties,
entitlements, or liabilities, such as a statute, contract, will,
promissory note, or share certificate. A document that does not
evidence legal rights or duties or set forth the legal basis for
the plaintiff's claims does not satisfy the definition of written
instrument." Cabrega v. Campbell Soup Co., No. 18-cv-3827, 2019 WL
13215191, at *5 (E.D.N.Y. Nov. 18, 2019).

　　Here, as in Singh, the declaration was "created long after
the events giving rise to this litigation and is thus not the type
of written instrument falling within the purview of Rule 10(c)."
See Ong v. Chipotle Mexican Grill, Inc., 294 F. Supp. 3d 199, 223
(S.D.N.Y. 2018) (striking a declaration and any conclusory
allegations in the complaint based on that declaration). The
Vitagliano Declaration "was drafted for the purpose of this
litigation," and accordingly the plaintiffs "could not have relied
on its terms while drafting their complaint." See id. at 224; see
also Chambers, 282 F.3d at 153 (explaining that a document may be
considered "where the complaint relies heavily upon its terms and
effect" such that the document is "integral to the complaint" and

the plaintiff relied on the document "in framing the complaint").
Although the declaration is referenced in the amended complaint,
"[m]erely mentioning a document in the complaint will not satisfy
[the integral to the complaint] standard; indeed, even offering
limited quotations from the document is not enough." Goel v.
Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016). There is no basis
on which the Court may consider Mr. Vitagliano's opinions as to
whether the Plan charged unreasonable recordkeeping fees. See Ong,
294 F. Supp. 3d at 224 (refusing "to accept as true any paragraphs
in [the] complaint alleging [the] expert's legal conclusions"). To
do so would "blur the distinction between summary judgment and
dismissal for failure to state a claim upon which relief can be
granted." DeMarco v. DepoTech Corp., 149 F. Supp. 2d 1212, 1221
(S.D. Cal. 2001); see Singh, 2023 WL 4350650, at *5.

In any event, the Vitagliano Declaration is simply a
conclusory statement of the plaintiff's argument and it does not
move the allegations from possible to plausible. See id. at *6.
The declaration offers no facts to support its conclusion that
"the Plan should have been able to obtain per participant
recordkeeping fees of $25-$30" other than Mr. Vitagliano's
"experience" and subjective review. Vitagliano Decl. ¶¶ 42, 47;
see also Cunningham v. Cornell Univ., No. 16-cv-6525, 2019 WL
4735876, at *9 (S.D.N.Y. Sept. 27, 2019) ("[G]eneral references to
an expert's experience do not provide a reliable basis for his

22

proposed testimony."); <u>Huang v. TriNet HR III, Inc.</u>, No. 20-cv-
2293, 2023 WL 3092626, at *8 (M.D. Fla. Apr. 26, 2023) ("Mr.
Vitagliano does not detail how his knowledge and experience led
him to calculate the fees for the relevant time period, or why
those numbers are reasonable in light of any features of the
Plan.").

Mr. Vitagliano attempts to confirm his analysis by
referencing a recent stipulation filed by Fidelity, as he did in
<u>Singh</u>. SAC ¶ 110 ("In a recent lawsuit where Fidelity's multi-
billion dollar plan with at least 58,000 participants like the
Plan was sued, the parties stipulated that if Fidelity were a
third party negotiating this fee structure at arms-length, the
value of services would range from $14-$21 per person per year
over the class period . . . ."); <u>see</u> <u>Singh</u>, 2023 WL 4350650, at
*6. And as in <u>Singh</u>, this stipulation cannot be considered because
it does not form part of the pleadings in this case and is not
binding on the parties in this case.[6]

---

[6] The plaintiffs and Mr. Vitagliano assert that the Fidelity
stipulation is significant because it suggests that the Plan could
have obtained comparable recordkeeping services at a lower cost.
<u>See</u> SAC ¶¶ 112-13; Vitagliano Decl. ¶¶ 47-48. But the Fidelity
plan included more than 58,000 participants and $17 billion in
assets under management, rendering any comparison to the Plan --
involving 22,000 participants and $3.2 billion in assets under
management -- inapposite.

**CONCLUSION**

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss is **granted**. The complaint is dismissed without prejudice to the ability of the plaintiffs to move to file an amended complaint. Any such motion must be filed within thirty days of the date of this Memorandum Opinion and Order and explain how any proposed amended complaint would resolve the defects in the current complaint. If no such motion is filed, the dismissal will be with prejudice. The Clerk is respectfully directed to close ECF No. 35.

**SO ORDERED.**

Dated:  **New York, New York**
        **November 13, 2023**

                                        _____
                                        John G. Koeltl
                                        United States District Judge

24